212 Cal.App.3d 734 (1989)
260 Cal. Rptr. 810
In re EMILY L., a Minor.
SANTA CLARA COUNTY DEPARTMENT OF SOCIAL SERVICES, Petitioner and Appellant,
v.
ANN P., Objector and Respondent.
Docket No. H004591.
Court of Appeals of California, Sixth District.
July 27, 1989.
*736 COUNSEL
Leo Himmelsbach, District Attorney, Robert J. Masterson, Deputy District Attorney, Donald L. Clark, County Counsel, and Diane L. Bennett, Deputy County Counsel, for Petitioner and Appellant and for Minor.
Anna L. Ollinger for Objector and Respondent.
OPINION
AGLIANO, P.J.
The department of social services (DSS) and the minor, Emily L., appeal from a judgment denying the department's petition to terminate the parental rights of the minor's mother, respondent Ann P., pursuant to Civil Code section 232.[1] Appellants contend the trial court erred as a matter of law in declining to terminate respondent's parental rights in the face of undisputed evidence compelling termination. We agree for the reasons stated below and reverse the judgment.

FACTS
Emily L., born prematurely April 24, 1985, was placed in protective custody directly from the hospital when she was three weeks old. A petition *737 was filed in juvenile court alleging the minor's mother had no permanent home, two of the minor's half-siblings were the subjects of section 232 proceedings, and a third half-sibling was a dependent child of the court who was undergoing a permanency planning hearing. Emily was declared a dependent child on October 18, 1985. (Welf. & Inst. Code, § 300, subd. (a).) In December 1985 she was placed in a foster-adoptive home, where she has since remained.
Respondent has a long history of drug and alcohol abuse, and an extensive criminal record dating back to 1977. When dependency was declared she was in custody on drug-related charges. The reunification service plan established for her included requirements that she complete a drug counseling program, refrain from possession or use of alcohol and illegal drugs, complete a parenting class, obtain stable housing, and visit regularly with Emily.
During the six-month period covered by this service plan, respondent enrolled in a parenting class and a drug program, and she visited twice with the minor at the jail facility. She did not obtain stable housing or the resources to pay for housing, however, and the social worker was not yet satisfied she would remain drug free. Nevertheless, due to respondent's incarceration and the lack of a "fair opportunity" to reunify with the minor, the social worker recommended extending services six more months. A second service plan was therefore signed on June 10, 1986, calling for the same conditions as the first, with an additional requirement that respondent submit to random drug testing. During the ensuing period respondent completed the parenting class, for which she received a "glowing evaluation," and she visited weekly with the minor. These visits became unsupervised in her home until respondent twice tested positive for PCP. She then entered a residential drug treatment program.
On November 7, 1986, an 18-month permanency planning hearing was held. The social worker recommended long-term foster care to avoid the legislative mandate to terminate reunification services after 18 months: "We could no longer recommend continued reunification so the choices were to recommend terminating parental rights, returning the child home or long-term foster care. [¶] At this point in time Ann was not in a position to have her child returned, and I wanted to give her more time to reunify so I didn't want to recommend terminating her rights at that hearing so this was the only other choice I had." The juvenile court adopted that recommendation. A third service plan was provided respondent, though she did not sign it. Visitation continued as before, until December 1986, when a scheduled extended visit was canceled because respondent had failed to appear for drug testing since early November 1986. The social worker informed *738 respondent that further visits would be arranged as soon as she provided a "clean" drug test; respondent repeatedly promised to appear for the tests but never did.
At the postpermanency planning hearing on April 24, 1987, the social worker changed her recommendation to a permanent plan of adoption. She felt that "things with Ann had deteriorated" to the extent that she could not foresee reunification. Accordingly, the juvenile court ordered that termination proceedings be initiated under Civil Code section 232 to facilitate the plan of adoption.
On September 9, 1987, DSS filed a petition to free Emily from respondent's custody and control under section 232, subdivision (a)(7).[2] The petition alleged that Emily had been in out-of-home care since September 1985, and that during this period respondent had failed, and was likely to fail in the future, to provide a home, care, and control of the minor despite the provision of reunification services. DSS concurrently filed a petition under section 7017 to terminate the parental rights of Emily's natural father, who had never shown any interest in her. The petition as to the father was granted October 23, 1987.
Hearing was conducted on April 12 and May 2, 1988. The minor's social worker testified regarding her efforts to promote "unification" between respondent and the minor, and described respondent's failure to comply with the three service plans provided.
Respondent, who was again in custody on drug-related charges, testified on her own behalf. She stated that she lived with a stable man who did not drink or use drugs, and that she had not used illegal drugs for about 10 months. She also stated that she had a job waiting for her upon her release from jail in July. Finally, she testified there were no pending criminal charges, and the sentence she was then serving was for a crime committed over three years earlier.
On cross-examination, respondent admitted that she had pled guilty in March 1988, to being under the influence of PCP on November 28, 1987, and that there was in fact a pending charge against her of being under the influence of PCP in the county jail on December 31, 1987. She also *739 acknowledged that her other three children had been freed from her custody and control.
The probation officer's report indicated that respondent's previous employer was not holding her job for her, but he might be willing to hire her in another capacity. Examination of respondent's recent criminal history confirmed the November 1987 incident and the December 1987 charge, and revealed an additional conviction in October 1987 for public drunkenness (Pen. Code, § 647, subd. (f)). In an interview with the probation officer, respondent felt she had resolved her drug problem, as she had "gotten `loaded' [on PCP] only once during the past six months." The probation officer found "nothing positive" in respondent's recent history, and concluded that it was "simply unfair to Emily to hold her `in limbo' waiting for a reformation which might never occur."
DSS urged the court to grant the petition so that Emily could have stability as a permanent member of an adoptive home. Counsel noted the minor was three years old, had never been in respondent's custody, and had not even seen respondent for more than sixteen months.
The trial court, in denying the petition, found there had been no instability in the child's life, as she had been in the same foster home for over two years. Furthermore, since "the mother is in jail, and she has got a long ways to go, and she is going to convince everybody she is a good mother.... what I am asking is what is the rush?" The court sympathized with respondent's status as a member of a "subculture" of alcoholics and drug addicts who "have very slim chances of getting themselves out of the predicament they are in, and ... are given a blueprint for success ... which they are not capable of succeeding at.... [¶] Now, that is the classic catch twenty-two a lot of people in our society spend an awful or an inordinate amount of their lives dealing with, and I think Miss [P.] is one of these people." The court acknowledged the statutory limits on reunification opportunities: "I know you are supposed to do all this in eighteen months and all that, and she has got a criminal record that would choke a horse, but ... there is a whole population out there that is just going to spend their whole life taking P.C.P. and doing nothing, and I think once in a while if somebody is making an effort the least we can do is pause and see what happened. [¶] That is all I am suggesting here, a pause to see what happened [sic]."
The court found that there was absolutely "no excuse" for respondent's noncompliance with drug testing, and that her failure to comply with that requirement for reunification indicated "either a too casual attitude about [her] responsibilities or just a hopeless ineptness on [her] part." It observed, however, that "sometimes some people have to have a longer leash, and if *740 they use the leash to hang themselves, then so be it." Accordingly, the court concluded that respondent should be given another chance to overcome the obstacles to reunification. "I think what is called for here is to make Miss [P.] toe the mark ... by giving her enough opportunities that will test her sincerity, and if she fails to take advantage of them that she will be writing her own record." The court admonished respondent to take advantage of the additional opportunity it was offering her, noting that "if any judge gets this back on a 232 petition ... it is going to be the easiest call in the world for the judge to make because you got one more opportunity than you deserved." The court then denied the petition.

DISCUSSION

1. Appealability

As a preliminary matter, we consider respondent's contention that the judgment is not appealable. We previously decided this issue in denying respondent's motion to dismiss the appeal. Confronted with the identical argument for dismissal, we reaffirm our previous ruling that the judgment is appealable. (1a) Respondent misunderstands section 238. The clause mentioning the right to appeal from an order freeing a minor from parental custody and control confirms the existence of that right; it grants no new rights of appeal nor does it take away existing ones. DSS and the minor's right to appeal denial of a section 232 petition is derived from Code of Civil Procedure section 904.1. (2) (See fn. 3.), (1b) Nothing in section 238 even suggests that this right has been revoked.[3]

2. The Merits

(3a) DSS and the minor contend the trial court failed to adhere to the "best interest of the child" standard and the statutory mandate to give dependent children permanent, secure homes without unnecessary delay. The court's denial of the petition, they argue, was therefore contrary to the express intent of the Legislature and must be reversed as a matter of law.
Welfare and Institutions Code section 361.5 gives parents of children in foster care 12 months, with a possible 6-month extension, to reunify with *741 their children. If a parent does not achieve reunification within that period, the juvenile court must conduct a permanency planning hearing to determine the appropriate permanent placement of the child pursuant to section 366.25. Subdivision (d)(1) of that section provides that if a child is adoptable, the court shall authorize the initiation of section 232 proceedings to free the child from the custody and control of the parent, with limited exceptions not relevant here. No further reunification services are contemplated;[4] instead, "[t]he overriding concern at this point is to provide a stable, permanent home in which a child can develop a lasting emotional attachment to his or her caretakers." (In re Baby Girl D. (1989) 208 Cal. App.3d 1489, 1493-1494 [257 Cal. Rptr. 1].)
In the present case, the juvenile court found on April 24, 1987, that placement of Emily in her mother's custody would be detrimental to the minor. The court further determined that Emily was an adoptable child. It therefore appropriately ordered the initiation of proceedings to sever respondent's parental ties to respondent in order to release her for adoption.
At the section 232 hearing the court was required by subdivision (a)(7) to determine, inter alia, whether placing the minor in respondent's custody would be detrimental to the child, and whether respondent had failed, and was likely to fail in the future, to maintain an adequate parental relationship with the child. The trial court acknowledged the uncontradicted evidence that despite numerous opportunities over a long period, respondent had failed to reunify with her daughter. There was no issue regarding the adequacy of reunification services. The court also expressed the opinion that respondent was unlikely to succeed in rehabilitating herself. This opinion was justified by the facts: respondent's other three children had been freed from her custody and control; she was currently incarcerated on drug-related charges; and she was facing another trial for recent drug abuse.
(4) To facilitate the goal of adoption, "`the state as a parens patriae not only has a compelling interest but also a duty to sever the parental bonds once a situation contemplated by the statute arises.'" (In re Laura F. (1983) 33 Cal.3d 826, 837 [191 Cal. Rptr. 464, 662 P.2d 922].) The court was therefore without discretion to deny the petition merely to give respondent yet another chance to reform.
The Legislature has emphasized that in a proceeding to sever the parent-child relationship it is the child's welfare, not the parent's, that is *742 paramount. (§§ 232, subd. (b), 232.5, 232.6.) Section 232, subdivision (b), provides, "At all termination proceedings, the court ... shall act in the best interests of the child." Section 232.5 states that "The provisions of this chapter shall be liberally construed to serve and protect the interests and welfare of the child," and repeats the directive to "act in the best interests of the child."
Section 232.6 clarifies the vague concept of "best interests of the child" by stating that a child's welfare and interests are served "by providing the stability and security of an adoptive home when those conditions are otherwise missing from his or her life." This section echoes the Legislature's concern for permanence and stability expressed in Welfare and Institutions Code sections 352 and 366.25.
(3b) In this case, the minor had been in foster care her entire life, almost three years, and had had only visitation contact with respondent. She had not seen her mother for over 16 months. Meanwhile, she had become attached to her foster-adoptive parents, who wished to adopt her. Her welfare compelled the severance of ties to respondent so that she could at last acquire a permanent home.
The trial court found that the minor had not experienced instability, as she had been in the same foster home for over two years. (5) Continuity in a placement setting, however, is not equivalent to the security and stability of a permanent home. The goal of permanency planning is to end the uncertainty of foster care and allow the dependent child to form a long-lasting emotional attachment to a permanent caretaker. "Foster placement, being temporary, does not do the trick because it warns the adults against any deep emotional involvement with the child. Even adoptive parents may hesitate to make a full commitment to the child as long as the placement is not irrevocable." (In re Micah S. (1988) 198 Cal. App.3d 557, 566 [243 Cal. Rptr. 756] (Brauer, J., conc.).)
(3c) The trial court viewed the prospect of unification with her child as an incentive to respondent to change "against all odds." It stated: "How do you give the person that is on the bottom any hope if you take away the only thing that provides the hope? ... [U]nless she has an incentive other than this boyfriend here, to become a recovered dope addict then she isn't going to.... [W]e may be holding in our hands the only motivation that will make her change, and that gives me pause to think about it, especially when the child isn't going any place [sic] anyway."
*743 Unfortunately, the time limit for rehabilitation had expired almost 18 months earlier, and there was no evidence that respondent would be able to establish an adequate parental relationship with the minor in the future. Furthermore, the Legislature has made clear that stability and permanence to a dependent child must be provided "as expeditiously as possible." (§ 232.3, subd. (a).) Throughout the dependency and parental termination statutes we find the admonition to accelerate proceedings so that the child is not kept "in limbo" any longer than necessary. Continuances are expressly discouraged. (Welf. & Inst. Code, § 352; Civ. Code, § 232.3, subd. (c).)
Emily was almost three years old by the time the section 232 hearing began. In the circumstances of record, termination proceedings would properly have been initiated after the 18-month permanency planning hearing; the minor was adoptable and respondent had failed to reunify by that time. The formation of a permanent plan of long-term foster care in order to extend reunification services beyond 18 months contravened Welfare and Institutions Code sections 361.5, subdivision (a) and 366.25, subdivision (d)(1).
Adding to the delay, the section 232 hearing did not commence until April 12, 1988, almost one year after the juvenile court ordered initiation of the proceedings. Filing of the section 232 petition alone took four months. Even during the termination proceedings, the court continued the hearing for three weeks, reasoning that since the mother was in jail at least until July, "[t]hat takes the edge off the urgency." These accumulated delays were contrary to "the public policy of this state that judicial proceedings to declare a child free from parental custody and control shall be fully determined as expeditiously as possible." (§ 232.3, subd. (a).) Any further delay could not have benefited the minor.
The trial court appropriately viewed the severance of parental ties as a drastic judicial action. It stated that it was "simply not prepared to make that decision [to terminate parental rights] today." However, by granting a "pause to see what happen[s]," the court prolonged the minor's uncertainty, contrary to the intent of section 232. (In re Angelia P. (1981) 28 Cal.3d 908, 923 [171 Cal. Rptr. 637, 623 P.2d 198].) Further, by shifting the focus from the minor's welfare to the rehabilitation of respondent, the court did not observe the law's overriding concern for the child's need for a permanent and secure home.

*744 DISPOSITION
The judgment is reversed. The superior court is directed to enter judgment granting the petition to free the minor from the custody and control of respondent.
Cottle, J., and Elia, J., concurred.
Respondent's petition for review by the Supreme Court was denied October 12, 1989.
NOTES
[1] All further statutory references are to the Civil Code unless otherwise noted.
[2] A child who is to be freed under this subdivision is one "[w]ho has been in out-of-home placement ... for a one-year period, if the court finds that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during that period, and are likely to fail in the future, to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child."
[3] We also reject respondent's assertion that the minor's appeal should be dismissed for failure to file opposition to respondent's motion to dismiss. Dismissal on this ground is discretionary. (Cal. Rules of Court, rule 41(c)). We find no indication that the minor intended to abandon her appeal, as she followed our denial of respondent's motion by timely filing her opening brief. We further decline respondent's request to strike the minor's opening brief for inadequate citation to the record. (Cal. Rules of Court, rule 18.) However, we will disregard argumentative statements made therein which are not supported by reference to the record.
[4] In this regard we note that the new permanent planning statute, applicable to children made dependents on or after January 1, 1989, expressly requires the court to terminate reunification services once it determines that the minor can not be returned to his or her parent. (Welf. & Inst. Code, § 366.22.)