Filed 10/29/15  In re S.D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re S.D., a Person Coming Under the Juvenile Court Law. _____ | D068184 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent v. STEVEN D., Defendant and Appellant, | (Super. Ct. No. NJ14853) |

APPEAL from an order of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, Dana C. Shoffner, Deputy County Counsel for Plaintiff and Respondent.

Steven D. (Father) appeals from an order terminating parental rights to his son S.D. under Welfare and Institutions Code section 366.26. (Undesignated statutory references are to the Welfare and Institutions Code.) Father does not ask for S.D.'s return; rather, he asserts the trial court erred in terminating his parental rights because guardianship was the better permanent plan for S.D. We disagree and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

On a morning in September 2013, six-year-old S.D. called 911 after finding his mother (Mother) unconscious on the kitchen floor. Mother tested positive for methamphetamine and benzodiazepines and was placed on an involuntary mental health hold. Police officers observed numerous prescription drugs in areas of the home accessible to S.D. There was also a bag of syringes on Mother's bed and an apparent suicide note. Father was in the Navy, stationed in Japan.

The San Diego County Health and Human Services Agency (Agency) filed a petition on behalf of S.D. under section 300, subdivision (b) alleging a substantial risk existed that S.D. would suffer serious physical harm or illness due to the parents' inability to care for him because of mental illness or substance abuse. At the detention hearing, the juvenile court appointed counsel for the parents, made a prima facie finding on the petition and detained S.D. in out-of-home care.

In December 2013, the juvenile court made true findings on the petition. It declared S.D. a dependent, removed him from Mother, found placement with Father would be detrimental and placed him in licensed foster care. It ordered reunification

2

services for both parents and directed the Agency to evaluate placing S.D. with the paternal grandparents who resided in another state.

At the June 2014 six-month review hearing, S.D. remained placed in a local foster home. The Agency recommended the parents continue to receive services and that S.D. be placed out of state with the paternal grandparents. Father remained stationed in Japan on a two-year military assignment and last saw S.D. in December 2013. In late June 2014, the juvenile court permitted the Agency to move S.D. to the paternal grandparents' home.

The Agency filed a section 388 motion to terminate the parents' reunification services because Mother had not participated in any aspect of her case plan and Father was unable to avail himself of services due to his deployment. In September 2014, the juvenile court ruled on the petition and terminated Mother's reunification services, but denied the request to terminate Father's services. At the contested 12-month review hearing in December 2014, the juvenile court terminated the Father's reunification services and set the case for a section 366.26 hearing.

In May 2015, the juvenile court terminated the parents' parental rights and selected adoption as the permanent plan. Father timely appealed.

                              DISCUSSION

Father contends the trial court erred in ordering adoption as the permanent plan because the beneficial relationship exception applied. We disagree.

The permanency planning hearing aims "to end the uncertainty of foster care and allow the dependent child to form a long-lasting emotional attachment to a permanent

3

caretaker." (*In re Emily L.* (1989) 212 Cal.App.3d 734, 742.) The primary consideration at the hearing is the best interests of the child. (*In re Kerry O.* (1989) 210 Cal.App.3d 326, 333.) At the permanency planning hearing the court has four choices, with termination of parental rights and ordering that the child be placed for adoption, as the first choice. (§ 366.26, subd. (b)(1).) "Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344.)

Whenever the court finds "that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption" (§ 366.26, subd. (c)(1)), unless it finds one of four specified circumstances in which termination would be detrimental. (§ 366.26, subd. (c)(1)(A)-(D).) One of the exceptions to the preference for adoption is the beneficial parent-child relationship exception, which exists where a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Father contends he regularly visited with S.D. and the juvenile court found the first prong of regular visitation had been met. The Agency does not challenge this finding. Accordingly, we focus on the second prong and examine whether S.D. would benefit from continuing his relationship with Father. (§ 366.26, subd. (c)(1)(B)(i).)

A beneficial relationship is one that promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with adoptive parents. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The parent must

4

show that the parent-child relationship is such that the child will be greatly harmed by the termination of parental rights, so that the presumption in favor of adoption is overcome. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854.) Implicit in this standard is that "a *parental* relationship is necessary for the exception to apply, not merely a friendly or familiar one." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) The existence of this relationship is determined by taking into consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*In re Autumn H.*, at p. 576.) We review the factual issue of the existence of a beneficial parental relationship under the substantial evidence standard of review and the determination of whether there is a compelling reason for finding that termination would be detrimental to the child under the abuse of discretion standard. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395; *In re J.C.* (2014) 226 Cal.App.4th 503, 530-531.)

The juvenile court found that while S.D. enjoyed his interactions with Father, whatever benefit conferred upon him by this contact was greatly outweighed by his need for stability. As we shall explain, the trial court did not abuse its discretion in finding that termination would not be detrimental to S.D.

First, although Father was living in Japan when the Agency took S.D. into protective custody, the record shows he failed to be proactive in protecting S.D. Mother and Father are married and Father knew Mother had a history of substance abuse. In 2009, in two separate incidents, Mother was found unconscious in a hotel, with S.D.

5

wandering in the hotel lobby. After the second incident it was reported that Father minimized the danger to S.D.

The family lived in Washington before moving to San Diego. While living there, Mother attended an inpatient program due to her prescription drug use. At one point, child protective services removed S.D. from the parents' care. Father obtained formal custody of S.D. and child protective services dropped the case because Father filed for divorce. Father, however, withdrew the divorce paperwork and the family moved to San Diego. Father stated that the family moved to San Diego to be closer to the maternal relatives and these relatives were the "back-up plan" should Mother have difficulty caring for S.D. Father, however, was aware that Mother alleged that the maternal grandmother had been physically and emotionally abusive when Mother was a child and that the two had a poor relationship.

Father points to his military service as preventing him from occupying more of a parental role in S.D.'s life. We disagree with this conclusion. The record shows Father turned a blind eye to Mother's problems and failed to act as a protective parent *before* his deployment. Father knew, or reasonably should have known, Mother would have difficulty caring for S.D. Yet, there is nothing in the record showing he sought out any type of assistance for Mother. Although the maternal grandmother lived in San Diego, Father's belief she could or would assist Mother in caring for S.D. was unrealistic as he knew Mother did not have a good relationship with the maternal grandmother. One of the principal roles of a parent is to protect children from "a substantial risk that the child

6

will suffer[] serious physical harm."  (§ 300, subd. (b)(1).)  The evidence suggests Father is unable to assume this role.

Additionally, the record is devoid of any substantial evidence showing when Father will be able to occupy more of a parental role in S.D.'s life.  Father was on a two-year assignment and believed he would return to San Diego in August or September 2015.  Nothing in the record shows Father was actively working with the military to turn his belief into a reality.  Even assuming Father returned to San Diego, the Agency and relatives expressed concern Father would again leave S.D. in Mother's care.  As the social worker noted, Father failed to recognize how his actions in leaving S.D. with Mother have impacted S.D.'s well-being.  Significantly, in February 2015, Mother was again hospitalized after overdosing on opiates.

The record simply does not show when Father might be able to occupy a parental role in S.D.'s life.  In the meantime, the paternal grandparents provided for S.D.'s daily needs and expressed a strong desire to adopt him.  The social worker stated that the paternal grandparents "have demonstrated that they are capable, motivated and supportive in providing [S.D.] with a protective and loving environment."  The social worker also noted that S.D. was "thriving" in his current placement and opined that the benefit of adoption outweighed any relationships that might exist.  The juvenile court was entitled to credit the assessments and conclusions of the social workers.  (*In re Casey D.* (1999) 70 Cal App.4th 38, 53.)

7

Finally, while Father contends legal guardianship should have been selected as S.D.'s permanent plan, the juvenile court is subject to the mandatory preference for adoption over legal guardianship. (§ 366.26, subd. (b)(1); *In re Fernando M.* (2006) 138 Cal.App.4th 529, 536.) On this record, the juvenile court did not err when it determined that Father's relationship with S.D. did not place him within the beneficial relationship exception. Accordingly, the juvenile court correctly determined that adoption was the appropriate permanent plan for S.D.

## DISPOSITION

The order is affirmed.

McINTYRE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.

8