Filed 7/12/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.M., a Person Coming Under Juvenile Court Law. | B315997 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 19CCJP00228C |
| Plaintiff and Respondent, | |
| v. | |
| D.S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Hernan D. Vera, Judge. Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

————————————————

Mother D.S. appeals the order terminating her parental rights to daughter, M.M., arguing the adoption assessment prepared by the Los Angeles County Department of Children and Family Services (Department) was inadequate, the court abused its discretion when it denied her request for a bonding study, and the Department conducted an inadequate initial inquiry under the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.). We affirm.

## BACKGROUND

We draw some of the following facts from our earlier opinion, *In re B.P.* (2020) 49 Cal.App.5th 886: On February 28, 2019, the juvenile court sustained an initial Welfare and Institutions Code section 300 petition alleging mother's three children, B.P., I.P., and M.M., were at risk of serious physical harm because mother was unable to address B.P.'s mental health and behavioral issues. (All further undesignated statutory references are to the Welfare and Institutions Code.) The Department did not initially detain the children, and mother agreed to comply with a court-ordered case plan. However, after new concerns arose, the Department filed petitions under sections 387 and 342, adding new allegations of drug use and domestic violence, and alleging that the prior disposition had been ineffective.

On November 25, 2019, the juvenile court issued a warrant authorizing the Department to remove the children from mother, and they were removed the next day.

The sections 342 and 387 petitions were adjudicated on July 30, 2020, and September 1, 2020. The court sustained allegations based on domestic violence and methamphetamine use and found the prior disposition to be inadequate. The court

2

removed the children from mother, and ordered that mother receive reunification services, including a full drug program, random testing, individual counseling, and monitored visitation to occur three times per week, for three hours each visit, with the Department having discretion to liberalize.

According to the Department's March 2021 status review report, M.M. was placed with paternal aunt. Mother missed 10 phone visits between June 2020 and September 2020, and she would not answer the Department's calls to help facilitate those visits. Mother would not agree to an in-person visitation schedule that paternal aunt offered to monitor. She did attend a visit on August 9, 2020, but arrived very late. Moreover, mother behaved inappropriately at the visit and yelled at paternal aunt. It was later decided that the Department would monitor mother's visits, but there were challenges with visitation because mother would not confirm her availability for visits, or canceled scheduled visits. Mother eventually visited on October 13, 2020, and the visit went well. However, mother did not show up for a scheduled visit on October 26, 2020. Mother was also struggling to comply with her case plan.

On March 2, 2021, the court terminated mother's reunification services for M.M. and set a permanency planning hearing for June 28, 2021.

A last minute information noted that according to M.M.'s caregiver, mother had five in-person visits between January 19, 2021, and February 14, 2021. However, she later missed a visit because she did not have gas. She also called, sometimes every day, and sometimes every other day, but the calls only lasted a few minutes.

An April 2021 report noted that mother had missed several in-person visits and was only visiting M.M. weekly via Zoom. Mother claimed that transportation was an issue, but she did not ask the Department for transportation assistance.

The Department's section 366.26 report noted that mother "has inconsistent visits." Mother would often arrive late or not at all. M.M. also reported that it made her upset when mother canceled visits. Mother would not answer M.M.'s calls.

Mother told the Department she had "too much" going on and wanted to change her visitation schedule to only visit on Sundays. Mother only had two Zoom visits in March 2021, two in-person visits in April 2021, and two in-person visits in May 2021 despite many other visitation opportunities that were made available to her. She "mostly cancels her visits." The report did not discuss the bond between mother and M.M. However, earlier reports noted that soon after M.M. was removed, she told the Department she wanted to be returned to mother, and that mother and M.M. shared a bond and attachment.

The adoption assessment did not provide details about mother's visitation or bond with M.M., other than that mother had only visited with her six times over the past six months.

At the section 366.26 hearing, mother testified that her visitation was inconsistent because of the pandemic, and that she was "going through a lot" and it was "hard for [her]." She also had transportation issues. She testified that M.M. wanted to be returned to her care.

During closing argument, mother's counsel noted that "[a] significant amount of the studying done about any bond that existed was dedicated to [M.M.'s] relationship with the caretaker.

4

But very minimal time was talked about my client's bond with her child even mentioned." Counsel then requested a bonding study to be sure that termination of parental rights "is the right thing to do [here]."

The court found that "[t]he parental benefit exception is a high bar" and that "there's a long history of missed visits, cancelled visits, and insufficient evidence in the record to support the parental exception." The court found that mother had "not maintained regular and sufficient visitation . . . and has not established a sufficient bond to merit the parental benefit exception." The court denied the request for a bonding study and terminated mother's parental rights, and mother timely appealed.

## DISCUSSION

### 1. Adoption Assessment

Mother argues the Department's adoption assessment was inadequate and failed to sufficiently include a review of the nature and frequency of the contact between mother and M.M. She also contends the juvenile court abused its discretion in proceeding with the section 366.26 hearing based on the incomplete assessment and in finding the beneficial relationship exception was inapplicable. We are not persuaded.

Whenever the juvenile court orders a section 366.26 permanency planning hearing, it must direct the Department to prepare an adoption assessment. (§§ 366.21, subd. (i), 366.22, subd. (b).) The assessment must include, among other things, "A review of the amount of and nature of any contact between the child and his or her parents or legal guardians and other members of his or her extended family since the time of placement. . . ." (§ 366.21, subd. (i)(1)(B).) Deficiencies in an

5

assessment report go to the weight of the evidence, and "if sufficiently egregious may impair the basis of a court's decision to terminate parental rights." (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413.) An adoption assessment is sufficient if it substantially complies with the requirements of the assessment statute. (*In re John F.* (1994) 27 Cal.App.4th 1365, 1378.) "[E]ven if the assessment is incomplete in some respects, the court will look to the totality of the evidence." (*Ibid.*)

The Department argues mother cannot challenge adequacy of the assessment because she did not object on this basis below. (*In re Urayna L.* (1999) 75 Cal.App.4th 883, 886 [waiver of issue of adequacy of adoption assessment].) We agree. Although mother requested a bonding study and noted there was not much information in the Department's reports about the bond between mother and M.M., she did not object on the basis that the report was inadequate to satisfy the statutory requirements for an adoption assessment.

In any event, her claim fails on its merits. Section 366.26, subdivision (c)(1)(B)(i) provides an exception to termination of parental rights if "[t]he parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship." (*Ibid.*, italics added; see also *In re Caden C.* (2021) 11 Cal.5th 614, 625–626.) The parent has the burden of establishing this exception. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.)

Here, the court found that mother did not satisfy the first prong of the exception because her visitation had been inconsistent. There was ample evidence from which the court could make this conclusion; the reports relied upon by the court thoroughly discussed the infrequency of mother's visits, and the

6

many visits that had been made available to her that she missed or canceled. Although the adoption assessment did not squarely address the bond between mother and M.M. or the quality of her visits, the evidence clearly established that mother's visits were few and brief, and mother's cancellations distressed M.M., which substantially complies with the requirement that the Department report on the amount of and nature of any contact between M.M. and mother.

Mother cites to several cases emphasizing the importance of the Department's reports in evaluating the parental-bond exception. However, the cited cases are inapposite because the parents' regular visitation had been established and was not in dispute. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 625–626; *In re J.D.* (2021) 70 Cal.App.5th 833, 854; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1226; *In re D.M.* (2021) 71 Cal.App.5th 261, 270.)

## 2. Bonding Study

Mother contends the juvenile court abused its discretion when it denied her request for a bonding study.

Evidence Code section 730 allows the juvenile court to appoint an expert to study the bond between a parent and child. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) A bonding study can be relevant at a hearing under section 366.26 to the question of whether the beneficial parent-child relationship exception should prevent the termination of parental rights. However, "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights. (*In re Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1339.) "[T]he denial of a belated request for [a bonding] study is fully consistent with the scheme of the

7

dependency statutes, and with due process." (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197.) Moreover, continuances in juvenile court are disfavored. (*In re Emily L.* (1989) 212 Cal.App.3d 734, 743.)

There was no abuse of discretion in denying mother's belated request for a bonding study and continuance, on the day of the section 366.26 hearing that had been pending for several months. Mother had not maintained regular visitation, so the parental-benefit exception was inapplicable.

## 3. ICWA Inquiry

Lastly, mother argues the Department did not satisfy its initial inquiry duty under ICWA.

### a. Relevant facts

On January 15, 2019, mother filed a parental notification of Indian status form (ICWA–020) indicating "I have no Indian ancestry as far as I know." That same day the court noted mother had filled out the ICWA–020 form and stated, "Based upon that information, the court finds that there is no reason to know the child or children are Indian children within the meaning of [ICWA] and finds that [ICWA] does not apply," but held any ICWA findings as to M.M.'s father in abeyance because he had not yet appeared in the case. The Department's report reflected that mother denied any Indian heritage in a January 24, 2019 interview, and that M.M.'s father denied any Indian heritage on January 29, 2019.

On February 28, 2019, father made his first appearance and filed a parental notification of Indian status form, also stating "I have no Indian ancestry as far as I know." The court found, "Based upon that, the court finds that there's no reason to

8

know the child . . . is an Indian child within the meaning of [ICWA] and finds [ICWA] does not apply."

The ICWA–020 forms admonished the parents to keep the Department, their attorneys and the court aware of any new information relating to possible ICWA status.

There is no evidence in the record that the Department ever asked paternal aunt, with whom M.M. was placed, or maternal grandmother, with whom the Department was in contact, about their Indian heritage.

### b.  Analysis

Congress enacted ICWA " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8.)  It is incumbent upon a state court administering a proceeding where child custody is at issue to inquire whether the subject child is an Indian child.  The scope of the duty on the court, as well as certain participants in the proceeding, is defined by federal regulations and related state law.  (See, e.g., 25 C.F.R. § 23.107; Welf. & Inst. Code, § 224.2; Cal. Rules of Court, rule 5.481.)

The duty of inquiry has three "phases."  Mother claims error with the first inquiry phase.  The first phase—the "initial inquiry"—applies in every case.  The initial inquiry requires the court and the Department to ask extended family members about the child's possible Indian ancestry.  (See § 224.2, subds. (a), (b), (c); *In re D.F.* (2020) 55 Cal.App.5th 558, 566.)

Where the "initial inquiry" gives "reason to believe" the child is an Indian child, but there is insufficient information to make a definitive determination, the second phase—"further inquiry"—comes into play.  (§ 224.2, subd. (e)(2).)  Further

9

inquiry requires more robust investigation into possible Indian ancestry.  (See *ibid.*; *In re D.F.*, *supra*, 55 Cal.App.5th at p. 566.)  If further inquiry gives the juvenile court a "reason to know" a child is an Indian child, the third phase is triggered.  (§ 224.2, subd. (e)(2).)  This phase requires that notice pursuant to ICWA be sent to the tribes to facilitate their participation in the proceedings.  (§ 224.3, subd. (a)(1); *In re D.F.*, at p. 568.)

"' "[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order.  [Citations.]  We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

As part of its initial inquiry, the Department was required to ask "extended family members," among others, "whether the child is, or may be, an Indian child . . . ."  (§ 224.2, subd. (b); *In re S.S.* (2022) 75 Cal.App.5th 575, 581.)  Although the Department asked the parents about Indian heritage, it failed to inquire of extended family members with whom the Department had contact.

In the absence of any evidence the Department complied with its section 224.2, subdivision (b) duty to inquire of extended family members, the juvenile court's finding that ICWA does not apply is error.  (See *In re Darian R.* (2022) 75 Cal.App.5th 502, 509 [finding error where evidence showed Department had contact with maternal aunt and maternal grandfather but failed to inquire of them regarding Indian ancestry].)  However, we can reverse only if the error was prejudicial.  (*In re Benjamin*

10

*M.* (2021) 70 Cal.App.5th 735, 742 (*Benjamin M.*), citing Cal. Const., art. VI, § 13.)

Courts are divided on what showing of prejudice warrants reversal for initial inquiry errors. "Although an appellant ordinarily has the burden of establishing prejudice [citation], a parent's ability to make this showing based upon the record in failure-to-inquire cases can be problematic . . . ." (*In re S.S.*, *supra*, 75 Cal.App.5th at p. 581.) This is because it is the responsibility of the Department to make and document its inquiries.

"Some courts have addressed this problem by requiring an appellant who asserts a breach of the duty of inquiry to, at a minimum, make an offer of proof or other affirmative assertion of Indian heritage on appeal." (*In re S.S., supra,* 75 Cal.App.5th at pp. 581–582, citing cases.) Others have excused such a showing, effectively treating failure to inquire as error per se. (See, e.g., *In re Y.W.* (2021) 70 Cal.App.5th 542, 556; *In re J.C.* (2022) 77 Cal.App.5th 70, 80.) The Fourth Appellate District in *Benjamin M.*, *supra*, 70 Cal.App.5th 735, took a third approach, concluding that "a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M.,* at p. 744.) Our court recently took a fourth approach, concluding initial inquiry errors require reversal only when the record of proceedings in the juvenile court or proffer of evidence made on appeal suggests a reason to believe that the child may be an Indian child. (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 779.)

We decline to follow the "error per se" line of cases. There are serious costs if courts delay finalizing permanency for a child in every case where extended family was not questioned, on the remote chance those relatives might have information which is inconsistent with the parents' disclaimer of Indian ancestry. (See *In re A.C.* (2022) 75 Cal.App.5th 1009, 1018–1024 (conc. & dis. opn. of Crandall, J.); *In re H.V.* (2022) 75 Cal.App.5th 433, 439–442 (dis. opn. of Baker, Acting P. J.).)

Under any of the other three lines of cases, the juvenile court's error here was harmless. On the record before us, further inquiry is unlikely to bear meaningfully upon whether M.M. is an Indian child. Mother and father appeared and unequivocally denied knowledge of any Indian ancestry.

No one has suggested there is any reason to believe M.M. might have Indian ancestry. M.M.'s parents certified they have no information M.M. may have Indian heritage, and no relative, not even paternal aunt with whom M.M. was placed, has provided any information to suggest M.M. has Indian heritage. As such, this case is unlike *Benjamin M.* There, the father was absent from the proceedings and no person from the father's side of the family had been asked about Indian ancestry. With information about ancestry on the father's side "missing," inquiry with a person sharing the father's ancestry "would likely have shed meaningful light on whether there [wa]s reason to believe Benjamin [wa]s an Indian child." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.)

There is nothing in the record indicating mother and father might have been unaware of having Indian ancestry. We therefore reject mother's "unvarnished contention that additional interviews of [relatives] would have meaningfully elucidated the

12

children's Indian ancestry." (*In re Darian R., supra,*
75 Cal.App.5th at p. 510.)

## DISPOSITION

The order terminating parental rights is affirmed.


GRIMES, Acting P. J.


I CONCUR:


HARUTUNIAN, J.[*]


---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


13

**WILEY, J., Dissenting.**

The right here belongs to tribes. What is the tribes' view of this controversy? We do not know. They have never been invited to the discussion. The entire appellate conversation has proceeded in their absence. The real parties in interest have no idea their rights are on the line in these cases.

We do know the Legislature, in recently enacting the statute at issue, overwhelmingly favored the tribes' perspective. Without any dissenting votes, legislators took the tribes' advice that *asking only the parents about Indian ancestry was not sufficient.* (See Sen. Daily J. (2017–2018 Reg. Sess.) pp. 5600 & 5894; Assem. Daily J. (2017–2018 Reg. Sess.) pp. 5552 & 6898.) That had been the old practice—ask only the parents and not extended family members—and the tribes spoke out against it. So the Legislature commanded the Department to ask "extended family members" about Indian ancestry.

How do we know this? Because the legislative history is extensive, compelling, and clear as a bell.

According to the report that motivated the legislation at issue, a tribal chief testified to Congress in 1978 that " '[c]ulturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People.' " (Cal. ICWA Compliance Task Force, Rep. to Cal. Atty. Gen.'s Bur. of Children's Justice (2017) p. 72 (Report), available at <https://theacademy.sdsu.edu/wp-content/uploads/2015/06/icwa-compliance-task-force-final-report-2017.pdf> [as of July 6, 2022], archived at <https://perma.cc/TEA9-R9V3>.)

1

This Report is a central authority for interpreting California's amended statute, for the Legislature relied on this Report to craft the legislation requiring inquiry of extended family members.  (Cal. Health & Human Services Agency, Enrolled Bill Rep. on Assem. Bill 3176 (2017–2018 Reg. Sess.) Sept. 4, 2018, pp. 5–6 [an organization formed "to press for the implementation of the Task Force 2017 Report recommendations" sponsored the measure leading to the amendments' enactment], available at <https://archive.org/details/2011-2018/GCBF_2018_Part_09/Ch0833_2018/page/n9/mode/2up> [as of July 7, 2022]; see *In re Antonio R.* (2022) 76 Cal.App.5th 421, 431–432.)

This same Report noted "there is no resource more vital to the continued existence and integrity of Indian tribes than their children . . . ."  (Report, *supra*, at p. vii.)

"Congressional hearings in the mid-1970s revealed a pattern of wholesale public and private removal of Native American children from their homes, undermining Native American families and threatening the survival of Native American tribes and tribal cultures."  (Report, *supra*, at p. 4.)

Our Supreme Court pointed to the " '*abusive child welfare practices* that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' "  (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah*), quoting *Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32, italics added (*Choctaw Indians*).)

Congress intended the federal Indian Child Welfare Act "to fulfill an important aspect of the federal government's trust responsibility to tribes by protecting the significant political,

2

cultural and social bonds between Native American children and their tribes." (Report, *supra,* at p. 6.)

"Despite ICWA's federal mandate, and despite the Cal-ICWA's passage in 2006, systemic problems with compliance persist. Tribal attorneys and representatives experience frequent resistance and dismissiveness from child welfare agencies, county attorneys and even courts when appearing in dependency cases. Procedural requirements designed to protect the connection between Indian children and their tribes are *too often viewed as requiring onerous paperwork, contributing to additional delays and creating impediments to permanence. . . .* [¶] . . . Absence of true understanding of the ICWA's purpose leads to *perfunctory compliance or complete violations of the law*." (Report, *supra*, at p. 9, italics added, fns. omitted.)

Pertinent to this appeal, the report explained "there are a variety of reasons why *relying on the parents does not necessarily protect the child's best interests, or the rights of the trib*e. Parents may simply not have that information, or may possess only vague or ambiguous information." (Report, *supra*, at p. 28, italics added.)

To repeat and reiterate, *it is not enough to ask only the parents*.

To help preserve native culture, the Report recommended requiring agencies like the Department to ask extended family members about Indian ancestry. The goal was to address a history of abuse and oppression.

The Legislature enacted this requirement.

In case after case, the Department has failed to obey the command of the statute, even when obeying this command would have been easy and simple. In this case, it would have taken less

3

than a minute, for the Department already was in communication with the extended family members. Yet Courts of Appeal continue to find this repeated failure to obey the Legislature is harmless.

This is my fourth dissent on this issue. The persistence of the problem suggests a Department-wide issue, not some issue with front-line social workers.

Everyone wants to eliminate delays in permanency for children. (*Choctaw Indians*, *supra*, 490 U.S. at pp. 53–54; *Isaiah*, *supra*, 1 Cal.5th at p. 12 ["swift and early resolution of ICWA notice issues is ideal"].) It is vital children get stability and security, and as soon as possible. The Department should do its job and reduce these delays.

The Department's error is not harmless. Due to its error, we do not know what these extended family members would have said. The Legislature told the Department to find out. It did not.

With every failure to identify a child with Indian ancestry, tribes lose an opportunity, one child at a time, to transmit their culture to future generations. Tribes have been losing futures for 500 years. The Legislature recently sought to do something about it. The Department, charged with defending the tribes' interest, has faltered. The tribes will discover, eventually, that once again their interest has been balanced away.

I would find prejudice.


WILEY, J.

4