Filed 9/19/16  In re Jasmine F. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re JASMINE F., a Person Coming Under the Juvenile Court Law. | |
| | D069918 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1183) |
| v. | |
| ANGELICA F., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Michelle Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Angelica F. appeals a juvenile court judgment terminating her parental rights to Jasmine F. and selecting adoption as the permanent plan. (Welf. & Inst. Code, § 366.26; all further statutory references are to this code unless noted.) Angelica contends the court erred in finding that no exception to adoption preference applied, i.e., the beneficial parent-child relationship. (*Id.*, subd. (c)(1)(B)(i); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) Angelica was able to show the court that she maintained regular visitation with Jasmine, and she argues that in light of their bond, the contact between them conveyed much more than an "incidental benefit." (*Autumn H.*, at p. 575.) She thus claims the evidence did not support the decision to sever her parental relationship.

The record does not show any lack of supporting evidence for the judgment, or any abuse of judicial discretion, and we affirm.

*FACTUAL AND PROCEDURAL BACKGROUND*

A.  Jurisdiction, Disposition, and Six-Month Hearing

In July 2014, then-eight-year-old Jasmine was staying with Angelica at a homeless shelter when a referral was made to the San Diego County Health and Human Services Agency (Agency) that Jasmine had a large purple-yellow bruise on her face. When interviewed, Angelica admitted to grabbing the child's face. Jasmine told authorities that she was afraid of her mom, who slapped her across the face. A medical doctor concluded

2

there was evidence Jasmine had been physically abused. She was taken into protective custody and detained in a confidential foster home. Her biological father is unknown.

The Agency filed a petition alleging that Angelica had excessively disciplined Jasmine, subjecting her to serious physical harm and substantial risk of injury by grabbing or slapping her several times. (§ 300, subd. (a).) In its detention report, the Agency stated it had received a referral in the past few days that Jasmine had facial bruising. When interviewed, Angelica initially denied abusing Jasmine, but admitted she got frustrated in trying to get her to stop crying, and grabbed her by both cheeks. Based on medical opinion, the Agency believed that returning Jasmine to an unchanged environment raised risks of further abuse.

Following investigation, the Agency's jurisdiction report recommended that a dependency case be established for Jasmine. Angelica had two older children who had been raised by relatives, and her adult son was in the process of obtaining guardianship of his 15-year-old sister (half siblings) in a probate court proceeding. Angelica's own mother had schizophrenia and the son believed Angelica showed the same type of illness and paranoia, and he consequently did not maintain a relationship with Angelica. He was unable to care for his half sister, Jasmine.

In August 2014, Angelica admitted to the allegations of the petition and the juvenile court asserted jurisdiction over Jasmine. She was placed in foster care, and the court ordered that Angelica receive reunification services, including weekly supervised visits. A court-appointed special advocate (CASA) was provided for Jasmine in October

3

2014. She reported that Jasmine had not been attending school regularly and was having academic problems. Angelica was still living in a homeless shelter.

Jasmine was moved from her original foster home in December 2014, due to allegations she and other children at that home were engaging in inappropriate sexual behavior. She participated in therapy for a while and was adjusting to her new, more specialized foster care placement. She had some difficult behaviors related to lack of hygiene and was learning new habits.

As of February 2015, the time of the six-month review hearing, Angelica had completed a parenting class, but had shown difficulty in understanding child development issues for an eight year old. Angelica would not participate in in-home parent training services. She attended individual therapy and kept up her weekly supervised visitation. At the review hearing, the court continued reunification services for another six months, while Jasmine remained with the foster mother (the caregiver).

B.  Twelve-Month Hearing and Termination of Reunification Services

During March through July 2015, Angelica received psychological evaluations. Angelica telephoned Jasmine regularly until May 2015, when she stopped.

In June 2015, a psychiatrist diagnosed Angelica with a schizotypal personality disorder, characterized by paranoid and obsessive thinking, and after other visits, changed her diagnosis to schizophrenia-paranoid type and posttraumatic stress disorder. The Agency social worker decided that supervision of visits was still necessary, and recommended that Angelica receive additional psychiatric treatment and follow-up. Angelica met with a therapist in June 2015 and attempted to participate in conjoint

4

therapy with Jasmine. However, the therapist terminated joint therapy because Jasmine showed discomfort when Angelica talked about inappropriate topics and could not be redirected.

Between June and August 2015, Angelica was discharged from a local homeless shelter after staff observed she seemed delusional and might need a psychiatric facility. She had shown difficulty participating in the shelter's healthy relationships class and could not remain on topic. She moved to another shelter. Angelica was struggling with mental health issues, believing everyone was against her and somebody wanted to hurt her child. She seemed unstable, was not taking medication regularly, and was unable to take responsibility for any protective issues.

In July 2015, the social worker discussed placing the child with her maternal aunt, who agreed to submit to a relative home assessment. Jasmine had been in the same foster home since February 2015 and, since she was the only child there, she was receiving her caregiver's full attention to her academic and behavioral problems, and seemed to be much happier.

According to the CASA's August 2015 report, she had supervised a few visits since October 2014 and noticed that although they were generally positive in nature, Jasmine chose her own activities and did not participate in those that Angelica suggested. The CASA recommended continuing supervised visits and implementing additional services for Angelica. During visits in the summer and fall of 2015, Angelica was showing more knowledge about child development. Although she still needed help during visits and once fell asleep, apparently because her medicine made her drowsy, she

5

empathized and interacted appropriately with Jasmine. Sometimes she treated Jasmine like a baby who needed extra help. According to the visitation center, Angelica had cancelled or not shown up for three visits, and the center planned to close her case if that kept occurring.

Angelica told an Agency social worker in August 2015 that she was back on the streets and did not intend to return to a shelter because she could not handle the people there. Around the same time, Angelica told workers that she could not offer any stability to Jasmine, so it would be best for her to remain in out-of-home care. Angelica explained there was nothing worse for a child than homelessness, as they had experienced it. Although Angelica started staying at a different shelter, she was asked to leave in September 2015 for not following the program's rules, but later was allowed to return to the day center. Angelica requested more time to receive reunification services and started psychiatric treatment. The Agency scheduled a team decision meeting to explore the plan of placing Jasmine with her maternal aunt, under guardianship.

In preparation for the 12-month review hearing in September 2015, the Agency recommended the case be set for a hearing to select and implement a permanent plan. The court found it would be detrimental to return Jasmine to parental custody and, although reasonable services had been provided, Angelica had not made substantive progress with the case plan. There was no substantial probability Jasmine could be returned to parental care by the 18-month date. The court terminated reunification services and scheduled a permanency planning hearing under section 366.26.

6

In September and October 2015, Angelica came to Agency offices and told social workers that people, including the caregiver, were punishing Jasmine all day by making her gag and holding her nose so she couldn't breathe and were giving her pills to control her. The social workers assured her Jasmine was safe and nobody was hurting her, but Angelica remained upset.

In December 2015, Angelica's psychiatrist noted that she was still presenting psychotic features and he had increased her medication recently, in an attempt to reduce her hallucinations. The doctor believed that she might not be taking her medicine, and her recently disclosed drug use in the past (methamphetamine) may have had a critical impact on her cognitive functioning.

### C. Permanency Planning Hearing and Ruling

The Agency prepared an assessment for the contested permanency planning hearing, which was continued from January to February 26, 2016. (§ 366.26.) The Agency evaluated Jasmine as both specifically and generally adoptable, as it was likely that the caregiver would be approved for adoption and if not, there were another five approved homes interested in adopting. Jasmine wanted to continue to live with the caregiver and was not showing any behavioral problems. The caregiver was willing to allow Angelica and the half siblings to have further contact and visitation, as long as the visits were appropriate and beneficial to Jasmine.

The assessment social worker observed four visits between October and December 2015. Angelica offered Jasmine snacks and generally watched her play on her own. They hugged hello and goodbye and said they loved each other, but sometimes did not

interact much. Once, Angelica had to be reminded not to talk about the case and got angry, yelling and leaving the room. Jasmine picked up the toys as requested and then sat quietly in a chair with her head down. She told the social worker she wasn't scared because she was used to Angelica acting that way. Another time, the two disagreed about Jasmine's Christmas list and the child started crying, hiding and refusing to participate. They started talking again and when Angelica hugged her goodbye, Jasmine did not hug her back. At another visit, Angelica found some of the games boring and stopped interacting with the child, falling asleep instead. When the visit was over they hugged goodbye. The caregiver explained that Jasmine was generally a happy child, and the visits were not upsetting to her.

In the CASA's January 2016 report, she observed affection being demonstrated between Jasmine and the caregiver. They attended church, where Jasmine participated in youth activities. She was making friends with girls her age and was going on local outings with the caregiver, who was committed to adopting Jasmine if reunification with Angelica did not work out. The caregiver was also open to maintaining Jasmine's familial relationships. The maternal aunt had other ongoing responsibilities and was not available to pursue custody. The CASA recommended termination of parental rights so Jasmine could be adopted.

The social worker observed that Angelica was still having mental health difficulties. In January and February 2016, she notified police that the caregiver wanted to suffocate her child and was making her vomit. The Agency investigated a referral alleging such physical abuse and concluded it was unfounded. Because of Angelica's

behavior and statements, the Agency switched her from the visitation center to having visits at its own offices, to increase the supervision. The social worker interviewed Jasmine privately and she said she was doing fine, was not being hurt or hit, and wanted to be adopted by her aunt or her caregiver. Regarding the adoption possibility, she felt bad for her mother but liked where she was living now.

The contested section 366.26 hearing was held February 26, 2016. Counsel submitted the matter as a document trial. The court received into evidence the assessment and addendum reports by the social worker and by the CASA. Although the social worker attended, she was not requested by the parties to testify. According to the Agency, it would not be detrimental to Jasmine if Angelica's parental rights were terminated, since the two were not observed to have a healthy parent-child relationship. On balance, the Agency believed that Jasmine was likely to benefit more from a permanent plan of adoption than from maintaining a relationship with Angelica. Counsel for Jasmine noted that she was flourishing in her current foster home, which was consistently supportive to her. Jasmine's counsel agreed with the Agency that although mother and child do have a relationship, Jasmine would not benefit from maintaining that relationship in such a manner as to outweigh the consistency and permanency that adoption would provide.

In argument, Angelica contended that since she had continued to visit Jasmine on a regular basis, they had kept up their bond such that detriment would be a likely result if those ties were severed. (§ 366.26, subd. (c)(1)(B)(i).) Angelica loved and worried about

9

Jasmine and wanted to continue to be a part of her life, and requested the court to adopt a lesser permanent plan than adoption.

At the close of the hearing, the court commented that Angelica had regularly visited and showed she was loving and caring toward Jasmine, even though there were times when she was late or missed visits. The court understood that Angelica has a deep and abiding love for Jasmine, who loves her mother. The court then analyzed the showing about the benefits to Jasmine from maintaining the parental relationship, as opposed to an adoption plan, and noted there were many benefits to adoption. Although Jasmine had lived with Angelica for a significant portion of her life, some of that time had been characterized by chaos and neglect and not meeting her needs. At times, Angelica showed she was unable to fully appreciate all of Jasmine's needs as a nine-year-old girl, and she treated Jasmine as younger than she was. Jasmine had blossomed and flourished under the security and stability provided to her in the caregiver's home over the past year.

Accordingly, the court found there was absolutely no evidence that a statutory exception applied, such that severing the natural parent-child relationship would deprive Jasmine of any substantial positive emotional attachment and therefore cause harm to her. The court determined it would not be detrimental to Jasmine to terminate parental rights, and a lesser plan than adoption would be a disturbance to her. Adoption was found to be in her best interests as the permanent plan, and Jasmine was referred to the Agency for adoptive placement. Angelica appeals.

DISCUSSION

I

*APPLICABLE STANDARDS ON TERMINATION OF PARENTAL RIGHTS*

The permanency planning process aims "to end the uncertainty of foster care and allow the dependent child to form a long-lasting emotional attachment to a permanent caretaker." (*In re Emily L.* (1989) 212 Cal.App.3d 734, 742.) The primary consideration at the hearing is the best interests of the child. (*In re Kerry O.* (1989) 210 Cal.App.3d 326, 333.) At the permanency planning hearing the court has numerous choices, with termination of parental rights and placement for adoption as the first choice. (§ 366.26, subd. (b)(1).)

To support an asserted beneficial relationship exception to adoption, the court must find "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); *In re C.F.* (2011) 193 Cal.App.4th 549, 553 (*C.F.*).) The juvenile court considers the detriment issue on a case-by-case basis, taking into account the many variables that can affect the parent-child relationship. (*Autumn H., supra,* 27 Cal.App.4th at pp. 575-576; *In re J.C.* (2014) 226 Cal.App.4th 503, 532 (*J.C.*).) Applicable factors include the child's age and amount of time spent in the parent's care, and whether the interactions have been positive or negative. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467 (*Angel B.*).) Whether the child has particular needs that the parent can best satisfy is important. (*Ibid.*) The court cannot quantify the amount of parental care provided when a child is in out-of-home care, and it should analyze the benefits of

11

continued contact between parent and child within the context of the visitation allowed. (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537-1538 (*Brandon C.*).)

This court in *In re Anthony B.* (2015) 239 Cal.App.4th 389, 395 (*Anthony B.*) applied a substantial evidence standard of review to the factual issues about the existence of a beneficial parental relationship, including regular visitation and contact with the child. On those factual issues, we make presumptions in favor of the judgment, while viewing the evidence in the light most favorable to the Agency and giving the judgment the benefit of all reasonable inferences. (*C.F., supra,* 193 Cal.App.4th at p. 553; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 (*L.Y.L.*).) Here, it is not disputed that Angelica met the requirements of showing her regular visitation and contact with Jasmine.

However, as to the statutory test for evaluating whether there is "a compelling reason for [determining] that termination would be detrimental to the child," a reviewing court applies an abuse of discretion test. (*Anthony B., supra,* 239 Cal.App.4th at p. 395.) This weighing process under section 366.26, subdivision (c)(1)(B)(i) involves the juvenile court's discretionary balancing of the significance and strength of the parent-child relationship against the benefits the child would derive from adoption. (*J.C., supra,* 226 Cal.App.4th at pp. 530-531; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

II

*APPLICATION OF CRITERIA: SUBSTANTIAL AND SIGNIFICANT BENEFIT*

The evidence showed that Jasmine is likely to be adopted, either by the caregiver or other approved local families wishing to adopt a child with such characteristics. Angelica contends she demonstrated there was a beneficial parental relationship of a

12

nature that should preclude adoption, or at least support a lesser permanent plan. (§ 366.26, subd. (c)(1)(B)(i); *Autumn H., supra,* 27 Cal.App.4th at p. 575.) To the extent Angelica contends that a plan short of adoption should have been selected, the juvenile court was subject to the mandatory preference for adoption over legal guardianship. (§ 366.26, subd. (b)(1).) "Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344; *In re Fernando M.* (2006) 138 Cal.App.4th 529, 536 [preference for adoption over other permanent plans is overridden only if statutory exception applies].) Also, the maternal aunt had been unable to participate fully in that capacity. On this record, we need only assess the showing about Jasmine's substantial benefit from continuing to have a parent-child relationship with Angelica.

Even acknowledging there was evidence in the record that Jasmine loves Angelica and she usually enjoyed their interactions, the issue before the juvenile court was whether that relationship remained so significant and compelling that the benefit to Jasmine of preserving it outweighed the stability and benefits to be provided by adoption. (*Anthony B., supra,* 239 Cal.App.4th at p. 395.) Over time, Angelica's participation in a parental role during supervised visitation was fairly limited and did not obviously enhance their relationship. Although Jasmine lived with Angelica for over eight years, their lifestyle was chaotic and Jasmine had experienced neglect during that time. Angelica told social workers in the fall of 2015 that she understood that Jasmine would suffer from continuing to grow up homeless with her. During visits toward the end of 2015, Angelica and

13

Jasmine were affectionate but often did not interact much during playtime. Angelica's mental health and social problems were consistently of a nature that made it unlikely for her to be able to provide a significant degree of security and stability to Jasmine. (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

The court was entitled to credit the assessments and conclusions of the social workers who documented the ongoing nature of the problems Angelica continued to face in developing her ability to parent effectively. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.) Jasmine did not have appear to have special needs that only Angelica could satisfy. (*Angel B., supra,* 97 Cal.App.4th at pp. 467-468; *Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.) Even within the context of the visitation allowed, the juvenile court had good reason to evaluate the evidence as showing that the benefits that Jasmine was deriving from continuing contact with Angelica were mainly incidental in nature, rather than clearly significant or substantial. (*Brandon C.*, *supra*, 71 Cal.App.4th at pp. 1537-1538; *Autumn H.,* at pp. 575-576; *C.F., supra,* 193 Cal.App.4th at pp. 558-559.)

Over the year that she had been living with the caregiver, Jasmine had been able to overcome some of her problematic behaviors and had grown in some positive ways. The protective and loving foster home allowed her to participate to a greater degree in school and outside activities than she had been able to do, when under Angelica's care. Also, the caregiver expressed willingness to allow continued family contact between Jasmine and Angelica, if it were beneficial and appropriate in nature. The record supports the court's conclusion that adoption would best promote the statutory purposes of stability and permanence for Jasmine. (§ 366.26, subd. (b)(1); *L.Y.L.*, *supra*, 101 Cal.App.4th at

14

p. 947.)  The juvenile court did not abuse its discretion when finding that the beneficial relationship exception to adoption did not apply to these parties.  (*Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.)

DISPOSITION

The judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


IRION, J.