Filed 12/6/21  In re S.S. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.S., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>N.S.,<br><br>Defendant and Appellant. | F082694<br><br>(Stanislaus Super. Ct. No. JVDP-20-000036)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Brian Bitker, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Lindy GiacopuzziRotz, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant N.S. (Mother) is the adoptive mother of 12-year-old minor S.S., who is the subject of a dependency case. Mother challenges the juvenile court's orders issued at a contested 12-month review hearing that resulted in S.S. remaining placed in out-of-home care and mother's reunification services being terminated. Mother contends the juvenile court's finding that return of S.S. to Mother would create a substantial risk of detriment to S.S. was not supported by substantial evidence. She also asserts that the juvenile court committed reversible error when it denied her trial counsel's request to continue the hearing. We reject these contentions and affirm.

## FACTS

### Initial Removal

On February 3, 2020, the Stanislaus County Community Services Agency (Agency) received a suspected child abuse report in response to S.S.'s disclosure that Mother's boyfriend touched her private parts while she was lying in bed. It was reported that S.S. did not tell her mother about the incident because she did not want to be removed from her care.

S.S. informed the social worker that she asked her mother's boyfriend to lie in bed with her because she was having trouble sleeping. In the middle of the night, S.S. was awakened when Mother's boyfriend touched the inside of her vagina. Mother's boyfriend immediately left the room after she told him to stop. The next time she saw him was when he woke her up in the morning.

S.S. stated that this was the first time her Mother's boyfriend touched her, but she was sexually abused by her biological father. Mother eventually adopted S.S. after she was placed in foster care because of the abuse inflicted by her biological father. S.S. reported constant fighting occurred in the home between Mother and Mother's boyfriend. S.S. further explained that she did not immediately tell mother about the incident because she did not believe Mother would do anything. She claimed her mother often defends her boyfriend.

2.

Mother stated it was normal for her boyfriend to lie in bed with S.S. to help her sleep and that he likely did it every other night. Mother had no concerns with this behavior despite her knowledge of S.S.'s past sexual abuse. The responding police officer was aware of numerous calls to Mother's home for domestic violence between Mother and her boyfriend. Mother's boyfriend continued to live in the home despite an active protective order in which Mother was the protected party.

A safety plan was eventually agreed to by Mother that would allow S.S. to stay with the maternal grandmother pending further investigation and completion of a "Team Decision Meeting." Mother also agreed that she would not allow her boyfriend back into the home until after the "Team Decision Meeting." However, on February 4, 2020, it was discovered that Mother's boyfriend was back in the home when the social worker spoke with the boyfriend on the phone. The next day, Mother admitted that both her boyfriend and S.S. were back in the home.

The agency obtained a protective custody warrant and served the warrant at Mother's home on the evening of February 5, 2020. Mother's boyfriend was arrested for violating the current protective order, and S.S. was taken into protective custody. According to notes from the Team Decision Meeting held February 6, 2020, Mother claimed S.S. was removed due to false allegations and that S.S. had a history of lying. Mother reported that documents related to S.S.'s individualized education plan, psychotropic medication, and counseling were proof that S.S. lies.

On February 7, 2020, the agency filed an original petition alleging S.S. was a child described by Welfare and Institutions Code section 300, subdivisions (b)(1) and (d).[1] The petition alleged that Mother failed to adequately protect the child from sexual abuse

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

and domestic violence. It also alleged that Mother refused to provide S.S. with prescribed psychotropic medications after S.S. was placed in protective custody.

The agency filed a detention report on February 7, 2020, which set forth the above events surrounding removal. The report also listed two prior reports of alleged physical abuse of S.S. by Mother, which indicated that the family was receiving family counseling services for two years as of 2018. At a detention hearing held February 14, 2020, the juvenile court ordered that S.S. be detained from Mother's custody, and it set a jurisdiction and disposition hearing for March 20, 2020.

**Jurisdiction and Disposition**

The report prepared for the jurisdiction and disposition hearing describes how Mother took placement of S.S. as a relative care provider at the age of 25, adopted S.S. at age 27, and was 29 at the time of S.S.'s recent removal. Mother claimed to no longer be in a relationship with her boyfriend of two years, who was alleged to have sexually abused S.S.

S.S. reported that she wanted to return to Mother's home since she believed Mother's boyfriend was the only one to blame for her removal. S.S. had an individualized education plan (IEP) certifying her as emotionally disturbed, and she had been receiving counseling services through both her school and the Center for Human Services. A psycho-educational assessment report and mental health evaluation report from a few months prior to S.S.'s removal detailed disruptive, defiant and aggressive behavior.

S.S. was placed with her maternal great aunts on February 27, 2020, but the aunts only wanted to serve as a temporary placement. Mother's first supervised visit with S.S. was noted as having limited conversation with long periods of silence, and Mother was observed studying during the visit.

At the jurisdiction and disposition hearing held March 20, 2020, Mother requested a contested hearing that was set for April 23, 2020. The agency filed a first amended

4.

petition and addendum report on April 16, 2020. The first amended petition included additional allegations that Mother was aware of the sexual abuse of S.S. by her biological father. It further alleged that Mother and her boyfriend were involved in an incident of domestic violence on March 28, 2020.

The addendum report detailed information contradicting Mother's claim that her boyfriend was no longer in the home. An incident report from the Oakdale Police Department noted that her boyfriend lived at the residence, and there was a history of domestic violence between mother and her boyfriend. At a "Child and Family Team" meeting on March 23, 2020, the need for S.S. to enroll in trauma-based therapy was discussed. However, Mother cancelled the appointment for S.S. to enroll because she did not believe S.S. should be attending counseling focused on trauma.

The aunts informed the agency that they would keep placement of S.S. through her birthday in mid-May, but they wanted the agency to find a more permanent placement for her. Once placed in her new foster home, S.S. was lying, having aggressive behavior towards other children, sneaking soda, and not sleeping well at night.

On May 29, 2020, S.S. was taken to the hospital to be evaluated for a mental health hold because S.S. reported to her foster parent that she was feeling depressed and wanted to kill herself. S.S. was released the next morning, and her aunts said they wanted S.S. back in their home for "the long haul." After a brief stay in a second foster home that S.S. enjoyed, the decision was made to return S.S. to the relative placement with her aunts.

The contested jurisdiction and disposition hearing was eventually held on June 16, 2020, after a continuance due to COVID-19. At the hearing, Mother admitted that she continued her relationship with her boyfriend even after S.S. was removed and concealed that fact from the agency. She now claimed to believe something inappropriate happened that night and that she did not fully understand how S.S. was particularly vulnerable to sexual exploitation. The juvenile court determined that the allegations in the amended

petition were true, removed S.S. from Mother's care, and ordered Mother to participate in reunification services.

**Six-Month Review Period**

The December 11, 2020 report prepared for the six-month review hearing recommended that reunification services continue to Mother, and the agency have discretion to allow overnight visits in Mother's home. In September of 2020, S.S. was moved from her relative placement back to a foster home where she was doing fairly well except for struggles with authority and defiance.

S.S. had been attending trauma-based therapy through Parents United for about two months before she chose to stop in November of 2020. She ceased therapy through Parents United because she believed her schedule was too impacted and no longer felt she needed to address trauma from her sexual abuse. Weekly therapy through the Center for Human Services continued for S.S. along with prescribed psychotropic medications to address her Attention Deficit Hyperactivity Disorder (ADHD).

Mother had completed eight individual counseling sessions to address the symptoms and effects of sexual abuse on children. Her future sessions were to be focused on issues related to domestic violence. The group facilitator for Mother's sexual abuse counseling group reported that Mother was attending regularly and presented as having gained some greater insight into her daughter's molestation. Mother had completed the majority of her parenting courses with a final parent-child lab scheduled in December of 2020.

Initially, supervised in-person visits occurred weekly at the relative placement of S.S., but they were eventually moved back to the agency when placement changed in September of 2020. Visits in October and November of 2020 generally went well except for a few incidents where Mother was short and had minimal interaction with S.S. On one occasion Mother accused S.S. of lying about changing a password for an Internet account, which resulted in the visitation supervisor redirecting Mother because S.S. was

becoming upset.  Mother stopped talking to S.S. after being redirected, and she ended the visit after a couple of minutes of silence.

At the six-month review hearing held December 11, 2020, the juvenile court adopted the agency's recommendation to continue reunification services and provided the agency with the discretion to start a trial visit immediately.

**Twelve-Month Review Period**

The March 22, 2021 report prepared for the 12-month review hearing recommended that reunification services to Mother be terminated, and S.S. remain in foster care.  The report noted that Mother was arrested on December 23, 2020, which was 12 days after S.S. was placed with Mother on a trial visit.  The arrest arose out of allegations that Mother knowingly aided a friend who shot a person that eventually died from the gunshot wounds.  After termination of the trial visit, S.S. was placed with a relative who gave notice to have her removed just one week after placement.  She was moved to another home in February of 2021, which is where she remained until the time of the 12-month hearing.

During the 12-month review period, Mother completed her parenting program and continued weekly domestic violence counseling with good progress.  The coordinator for Mother's sexual abuse counseling noted that Mother attended regularly but would not share why S.S. was not in her care.  Supervised visitation resumed in January of 2021 with some visits going well and others involving limited talking and interaction between Mother and S.S.  At an in-person visitation on February 11, 2021, Mother was observed grilling S.S. and accusing her of lying.  Mother stormed out of the visit 45 minutes early after visitation staff attempted to redirect the conversation.

The agency recommended out-of-home care continue for S.S. because it was concerned that Mother's actions leading to her arrest were contrary to her demonstrating she has safe parental capacities.  Mother submitted a letter to the juvenile court where she

7.

stated, "Yes, I put myself in a very bad situation which led to my arrest, but if [S.S.] would have been here it would not have happened."

**Contested 12-Month Review Hearing**

At the 12-month review hearing held March 22, 2021, Mother requested a contested hearing, which was set for April 16, 2021. The contested hearing began with the agency's counsel calling the current social worker to testify. Prior to any questions being asked, Mother's counsel interrupted to request a continuance based on his learning that the agency's counsel received a police report related to Mother's December 23, 2020 arrest on the day before trial.

Mother's counsel also indicated that he was not provided with "additional information" that the social worker would be testifying to. He claimed he was unable to adequately prepare for trial and determine if Mother should testify without the police report and additional information. He did not state how long he would need to obtain the police report, and the agency's counsel indicated that the prosecuting agency would not allow further dissemination of the report while the investigation was ongoing. He acknowledged that he was aware of her arrest and was waiting until she was arraigned to subpoena any police reports.

Counsel for the agency clarified that it would not be using any of the information from the police report in its case, and she would only proceed based on the information that the social worker obtained directly from Mother about her arrest. The juvenile court indicated that it was going to proceed and that it would "see what happens from here …."

The social worker testified about a conversation that she had with Mother about her arrest. Mother reported to her that "she helped out a friend who stayed at her house and that the friend was planning on going back to Arizona and that she didn't know that she was doing anything wrong." She also testified that Mother claimed the friend was only in her home for a short period of time and "that mainly his stuff was at her home." While explaining her thought process behind her decision to allow a person who shot and

8.

killed someone into her home, Mother just stated "she didn't know that – what would happen, that she was just helping out a friend."

In a later conversation with the social worker, Mother claimed she did not know that she was doing anything wrong because her friend told her that he shot the other person in self-defense. The Mother's arrest was concerning to the agency because it appeared that Mother was "making decisions that are not safe for herself and/or [S.S.], and so the Agency has concerns that she's still struggling with her protective capacity, and she hasn't really demonstrated that she has made progress in that area."

On cross-examination, the social worker acknowledged having notes from her conversation with Mother about the arrest that took place in January. These notes had not yet been provided in discovery, and the agency's counsel confirmed that Mother's counsel made a late discovery request on the week of the hearing. The juvenile court allowed a recess for the social worker to obtain the notes and provide them to Mother's counsel. After the recess, Mother's counsel made no further requests related to the social worker's notes.

After reviewing her notes, the social worker clarified that Mother stated her friend stayed with her for a couple of months, and she believed the shooting occurred in September of 2020. The social worker was unaware of the identity of Mother's friend, specific charges he was facing, or the status of Mother's criminal proceedings. The social worker and Mother had conversations about the arrest on both January 6, 2021 and March 29, 2021. In the first conversation Mother claimed she did not understand why she was arrested, and that S.S. was not in her care at the time her friend stayed in the home.

Mother's counsel then expanded the scope of his examination to ask the social worker about any concerns during Mother's visits with S.S. The social worker discussed the February 11, 2021 visit where Mother tried to address S.S.'s tendency to not tell the truth, which led to a disagreement and Mother deciding to leave the visit. It was further

9.

explained that Mother struggles to manage and address the issue when S.S. is not being truthful.

S.S. had been moved to three different placements since the trial visit with Mother was terminated in December of 2020. On April 11, 2021, S.S. was taken to the hospital to be evaluated after she told her care provider's sister, " 'I know where the knives are, and I can stab you.' " She was sent home after hospital staff determined she was not a danger to herself or others. This same care provider has expressed a willingness to keep S.S. in her home as long as S.S. needs to be there. S.S. recently began an intensive service program called "Wraparound" that consists of a team of trauma-oriented services providers.

Counsel for the agency argued that it had met its burden to prove that it would be detrimental to return S.S. to Mother's care. This detriment was asserted to arise from Mother's decision to storm out of a visit when discipline was required and failure to appreciate the safety risks posed to herself and S.S. by individuals she has allowed to live in the home.

Counsel for S.S. agreed with the agency's recommendation despite S.S.'s stated wishes to return home to Mother. She asserted that the failure to protect element of the case was still present given Mother's admission of allowing "a murderer into her home."

Mother's counsel argued Mother did not know that the person she allowed to live in her home might have committed a murder. Instead, he suggested that she merely let someone into her home who made a bad choice in the months prior to S.S. being placed on the trial visit in December of 2020. He also claimed that despite some issues with addressing S.S.'s lying behavior, Mother would be capable of caring for S.S. with the assistance of the Wraparound program.

In its ruling, the juvenile court began by acknowledging that S.S. "has been through an awful lot in her very young life" and "has a lot of acting out behaviors that are difficult to control." It reasoned that if Mother could not handle resolving a conflict with

10.

S.S. during a visit then, "I don't understand how in the world she can really handle having [S.S.] back in her care full time." Furthermore, it was concerned with Mother's pattern of really poor choices and could not understand Mother's excuse that the situation would have been different if S.S. had been in her care. The juvenile court ultimately found that the return of S.S. to Mother would create a substantial risk of detriment to S.S., terminated Mother's reunification services, and scheduled a section 366.3 review hearing for October 4, 2021.

On April 23, 2021, Mother filed the present notice of appeal.

## DISCUSSION

### I. Finding of Detriment to Return

Mother contends the evidence was insufficient to support the juvenile court's finding that return of S.S. to Mother's home would be detrimental to her safety, protection, or physical or emotional well-being. It was insufficient, she argues, because there was no evidence that Mother's friend was in the home at the same time as S.S. and no other concerns were reported during the 12-day trial visit that S.S. had with Mother prior to her arrest. Therefore, she contends, the juvenile court erred in not placing S.S. with her. We disagree.

### A. *Legal Principles*

California's dependency system is designed to provide for the protection and safety of a minor who comes under the jurisdiction of the juvenile court and, when consistent with the minor's welfare, to preserve the minor's family ties. (§ 202, subd. (a).) At each dependency review hearing there is a statutory presumption that the child will be returned to parental custody. (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) Section 366.21, subdivision (f)(1) governs the 12-month review hearing and provides:

> "After considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of his or her parent …

11.

unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment."

"In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement. [Citations.]" (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)

"[T]he decision whether to return the child to parental custody depends on the effect the action would have on the physical or emotional well-being of the child. [Citation.]" (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) While compliance with the reunification plan is a pertinent consideration, it is not conclusive evidence that a parent poses no risk of detriment to his or her child. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704 (*Constance K.*).) The trial court must also determine whether the parent has the capacity to provide for the child's safety and well-being at the time of the review hearing. (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139–1140; *In re Joseph B., supra*, 42 Cal.App.4th at p. 901.)

Section 366.21 "does not state or imply that, in order to keep a minor out of parental custody, the serious risk of detriment posed by returning the minor to his or her parent must involve the same type of harm which formed the basis for the dependency and the removal of the minor from parental custody." (*In re Joseph B., supra*, 42 Cal.App. 4th at p. 898.) In determining whether there is a risk of detriment, the juvenile court considers factors, including, but not limited to:

> "[W]hether the natural parent maintains relationships with persons whose presence will be detrimental to the ward [citation]; instability in terms of management of a home [citation]; difficulties a minor has in dealing with others such as stepparents [citations]; limited awareness by a parent of the emotional and physical needs of a child [citation]; failure of a minor to have lived with the natural parent for long periods of time [citation]; and

12.

the manner in which the parent conducted himself or herself in relation to the minor in the past. [Citations.]" (*Constance K., supra*, 61 Cal.App.4th at p. 705.)

### B.    *Standard of Review*

We review a finding of detriment to determine whether the record is supported by substantial evidence. "In so doing, we consider the evidence favorably to the prevailing party and resolve all conflicts in support of the [juvenile court's] order. [Citation.]" (*In re Yvonne W., supra*, 165 Cal.App.4th at p. 1401.) We do not inquire whether the evidence supports a contrary finding but instead whether substantial evidence, contradicted or not, supports the finding actually made. (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 925.) On this record, we conclude substantial evidence supports the juvenile court's detriment finding.

### C.    *Analysis*

The detriment to S.S.'s safety, protection, emotional, and physical well-being, if returned to Mother's custody, was her continued failure to maintain a safe home and provide proper discipline for S.S.'s behaviors. Despite months of participating in reunification services, Mother still failed to appreciate the danger posed by individuals that she brought into her home. The primary reason for S.S.'s removal was Mother's failure to appreciate the risk that her boyfriend might sexually abuse her child when she allowed him to lie in bed with her at night.

A court may appropriately consider the parent's past conduct as well as present circumstances. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) Mother's past conduct involves her not knowing that her friend, who admitted to shooting someone, was a possible gun offender.[2] In as much as it also involves her not knowing that her

---

[2] It is true that the record does not explain all the details of this event. But even Mother acknowledged in a letter to the court: "I realize I have made mistakes …. Yes, I put myself in a very bad situation which led to my arrest, but if [S.S.] would have been here it would not have happened." While we do not know every detail of these events,

boyfriend, who wanted to lie in bed with her previously molested daughter, was a possible sexual predator. This continued failure to appreciate the risk that her own conduct and decisions posed to the safety of those in her home establishes ongoing risk of detriment to S.S.

At each review hearing the juvenile court must also consider the efforts made by the parent to mitigate the causes necessitating out-of-home placement and by the agency to return the child to a safe home. (§ 366, subd. (a)(1).) Mother's contention that the child was not at risk because Mother's friend was no longer in the home at the time of the trial visit is unavailing. During the reunification process, a parent who wishes to successfully reunify must make a safe home for their child to be returned. To ignore a parent's conduct during the time periods that the child remains out of their care would leave a substantial gap in the juvenile court's assessment of detriment.

Mother's failure to appropriately address discipline issues with the minor during visitation is also relevant to the "the manner in which the parent conducted himself or herself in relation to the minor in the past." Contrary to Mother's characterization that the juvenile court "seemed to key in on a single visit", there were multiple visits where Mother was observed to have limited interaction and perform other tasks during the visit. In addition, to the February 11, 2021 visit where Mother stormed out of a visit after "grilling" S.S. for lying and had to be redirected by visitation staff. An electronic visit on October 1, 2020, ended in a similar fashion when Mother continued to accuse S.S. of lying, was redirected by visitation staff, and sat silently before ending the visit.

Finally, the fact that there were no reported concerns during a 12-day trial visit prior to Mother being arrested is certainly not conclusive evidence that S.S. was safe in Mother's care. Mother's suggestion that this fact "gives lie to the juvenile court's conclusion" is an invitation to reweigh the evidence and give greater consideration to

---

there was sufficient evidence for the court to conclude that this was another instance of Mother displaying poor judgment in who she chose to associate with.

14.

evidence that is unfavorable to the juvenile court's finding. We must "accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

Here, the juvenile court identified Mother's pattern of making unsafe choices in relation to the individuals she allows into her home, S.S.'s difficult to control behaviors, and Mother's inability to resolve conflict and manage S.S.'s behaviors. Mother's suggested alternative of placement with unannounced home visits would not eliminate the risk of detriment given her past evasive behavior and history of deceiving the agency about who was residing in her home. On that evidence, the juvenile court could properly find that S.S. was exposed to a substantial risk of detriment if returned to Mother.

## II. Denial of Request to Continue

Mother contends the juvenile court committed reversible error in denying Mother's request for a continuance of the contested 12-month status review hearing. Mother argues that the error is structural in nature because the agency indicated that it recently received a police report and provided social worker's notes on the day of the contested hearing.

### A. *Legal Principles*

Section 352, subdivision (a)(1) provides that a juvenile court "may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements."

Continuances are expressly discouraged in the juvenile court and "should be difficult to obtain. [Citations.]" (*Jeff M. v. Superior Court* (1997) 56 Cal.App.4th 1238,

1242.)  The dependency statutes consistently encourage courts to accelerate proceedings, so the child is not kept "in limbo" any longer than is absolutely necessary.  (§ 352; *In re Emily L.* (1989) 212 Cal.App.3d 734, 739.)  The moving party has the burden to demonstrate good cause for a requested continuance.  (See Evid. Code, §§ 500, 550, subd. (b).)

### B.    *Standard of Review*

"A reviewing court will reverse an order denying a continuance only upon a showing of an abuse of discretion.  [Citation.]"  (*In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187.) However, Mother contends the denial of her request for a continuance deprived her of due process and constituted structural error, relying on *Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535.  In *Judith P.*, the parent's attorney received a status report on the morning of the section 366.21 hearing, and the trial court denied a continuance to permit counsel time to obtain documents countering the facts discussed in the report.  (*Judith P.*, at pp. 543–544.)  The appellate court, relying heavily on criminal cases, held that the notice requirement of section 366.21, subdivision (c) is mandatory and obligatory and that a failure to comply with the statute was a violation of the parent's due process rights and per se reversible.  (*Judith P.*, at pp. 553–558.)

First, we note that the present case is distinguishable from the situation presented in *Judith P.*  Here, the agency *timely* filed the status review report on March 9, 2021, and the only additional information introduced at trial came in the form of testimony by the social worker about a conversation she had with Mother.

Second, even if *Judith P.* had been factually analogous, it predates Supreme Court decisions that have indicated that orders in dependency proceedings are subject to harmless error review.  (See *In re James F.* (2008) 42 Cal.4th 901, 915–916; *In re Celine R.* (2003) 31 Cal.4th 45, 59–60.)  "[S]ignificant differences between criminal proceedings and dependency proceedings provide reason to question whether the structural error doctrine that has been established for certain errors in criminal

16.

proceedings should be imported wholesale, or unthinkingly, into the quite different context of dependency cases. [Citations.]" (*In re James F.*, *supra,* at pp. 915–916.) In *In re James F.*, the Supreme Court held that, in the dependency context, "[i]f the outcome of a proceeding has not been affected, denial of a right to notice and a hearing may be deemed harmless and reversal is not required. [Citations.]" (*Id.* at p. 918; see also *In re A.D.* (2011) 196 Cal.App.4th 1319, 1326–1327 [declining to apply structural error analysis to claim of failure to give notice of dependency proceeding]; *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1419–1420 [same].)

We therefore reject Mother's claim of structural error and instead will apply the abuse of discretion standard. (See *In re Gerald J.*, *supra*, 1 Cal.App.4th at p. 1187.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) Under the abuse of discretion standard of review, a court's ruling will not be disturbed unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*Id.* at p. 318.) For the reasons set forth below, we conclude no prejudicial abuse of discretion occurred.

## C. *Analysis*

First, the lack of prior production of the social worker's notes was remedied by the juvenile court arranging for the agency to produce them and providing a recess for Mother's counsel to review and conduct further cross-examination. The subject matter and details of the conversation would have also been equally available to both parties since Mother was one of its two participants. Mother's counsel raised no further issue with regard to the social worker's notes after the court gave him a recess to review them, and he continued with cross-examination based on those notes.

Second, there is no contention that the police report was necessary to rebut any of the evidence introduced by the agency, and nothing prevented Mother from providing such testimony on her own. Mother merely speculates that the police report may have contained statements by Mother that she did not want to contradict by providing testimony at trial. However, she already provided multiple statements to the social worker and another addressed specifically to the court related to the events that led to her arrest. And, as counsel for the agency and the court noted, Mother's counsel could have subpoenaed records pertaining to the incident upon receipt of the report in early March.

The juvenile court allowed cross-examination of the social worker and in no way prevented Mother from introducing her own testimony or other relevant evidence. Mother's claimed need for her counsel to review a police report that was not introduced into evidence does not establish either an abuse of discretion or prejudice.

Third, section 352 provides that a continuance shall not be granted that is contrary to the interest of the minor. (§ 352 (a)(1).) Contrary to Mother's assertion, any need to delay the hearing for an undetermined time for Mother's counsel to attempt to obtain a copy of the police report from Mother's arrest was contrary to the interests of the child.

S.S. had been through multiple placement changes while facing continued uncertainty as to her permanent home for more than a year. A continuance would have in fact delayed the selection of the plan for S.S. to remain in foster care with a permanent plan of placement with a fit and willing relative. In considering the juvenile court's need to seek prompt resolution of the case, provide S.S. with a stable environment, and avoid damage from prolonged temporary placements, it was both reasonable and rational for the juvenile court to avoid further delay.

Finally, the case of *In re Dolly A.* (1986) 177 Cal.App.3d 195 cited by Mother, is distinguishable in that it was decided prior to the amendment of section 352, which exempted a pending criminal prosecution as good cause in and of itself. (*In re Katrina L.*, (1988) 200 Cal.App.3d 1288, 1295.) The relevant information surrounding

18.

Mother's arrest was readily obtained from the social worker's testimony and Mother's statement to the court, and it could have been supplemented by Mother's own testimony. Additional details that may or may not have been contained in the police report were presumably of minimal, if any significance given what was already disclosed to the social worker by Mother. The juvenile court's refusal to delay the hearing for an attempt to obtain the police report was not arbitrary, capricious, or absurd. Therefore, we find no error on this record.

## DISPOSITION

The juvenile court's orders are affirmed.

POOCHIGIAN, ACTING P. J.

WE CONCUR:

DETJEN, J.

SMITH, J.