Filed 4/27/23  In re A.G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | |
| | D081179 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J520082) |
| Plaintiff and Respondent, | |
| v. | |
| R.G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Margie G. Woods, Judge.  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

This is the second of two appeals in this juvenile dependency case. In the first appeal, filed by D.G. (Mother), we reversed the juvenile court's order terminating parental rights to her minor daughter, A.G., pursuant to Welfare and Institutions Code section 366.26[1] on the ground that we were unable to determine whether the juvenile court had applied the correct legal standard under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) in finding the beneficial parent-child relationship exception to adoption did not apply. (*In re A.G.* (Mar. 1, 2022, D079606) [nonpub. opn.] (*A.G. I*, the prior opinion).) We additionally concluded the San Diego County Health and Human Services Agency (Agency) failed to conduct an adequate inquiry under the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.). We instructed the juvenile court on remand to conduct further proceedings consistent with *Caden C.* and ICWA.

On remand, the juvenile court held another section 366.26 hearing and again terminated parental rights. R.G. (Father) now appeals, contending only that the juvenile court erred by not applying the beneficial parent-child relationship exception to preclude the termination of his parental rights. We conclude there was no error and affirm.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### I. *Prior Proceedings*[3]

In July 2019, police searched Mother and Father's home and found methamphetamine, marijuana, drug paraphernalia, and a loaded .32 revolver, some of which was accessible to A.G. Mother and Father were arrested and charged with drug-related offenses. A.G. was taken into protective custody and placed with paternal uncle and paternal aunt (caregivers).

At the detention hearing, the court declared A.G. a dependent and ordered voluntary services and liberal, supervised visitation for Mother and Father. During the six- and twelve-month review periods, the parents had several supervised visits with A.G. The caregivers reported that A.G. was "always excited" to see them and enjoyed their visits. These positive reports led the Agency to briefly lift the supervision of the visits. But during the unsupervised visitation period, the caregivers reported A.G. was returned to them unfed, "dirty and messy," and with bug bites on her back. The parents were also often tardy picking her up, sometimes appearing hours late without notice.

The Agency expressed concerns about the parents' mental health, substance abuse, and inability to control their anger. At A.G.'s third birthday party in July 2020, Father became angry and belligerent, yelled at A.G. and other adults, pushed the paternal uncle, tried to push the paternal

---

[2] Because the juvenile court's ICWA findings are not at issue in the present appeal, we limit our discussion to the facts relevant to application of the beneficial parent-child relationship exception.

[3] We take the factual background in part from our prior opinion. (*A.G. I, supra*, D079606.)

3

grandmother, and at one point raised his hand as if to hit Mother. Mother also became upset, screaming and yelling at family members. A.G. appeared afraid and made comments afterwards (" '[poor] mommy, daddy hit her' ") suggesting she had previously witnessed Father hitting Mother. During another incident in August 2020, Father kicked in the front door of the maternal grandfather's house, pulled out a pocket knife, and threatened to kill him. The Agency reverted the parents' visits with A.G. to supervised.

During the 18-month review period, Mother and Father continued to visit A.G. often, and the visits were generally positive. A.G. eagerly waited to be picked up for the visits, was always happy to see Mother and Father, hugged and kissed them, and "truly appear[ed] to love" them. Mother brought games and toys for A.G., talked and played with her, and sometimes read to her. Father, too, would sometimes play with A.G. At other times, however, Father would "just stare[ ] at [A.G. and Mother]," would not say much, and usually would not play unless Mother told him to. At the conclusion of the visits, A.G. would tell her parents she loved them but would appear ready to leave.

Not all of the parents' visits with A.G. were positive. Sometimes after a visit, A.G. would tell the caregivers, "no more mommy and dada." She went home early from one visit crying because her parents were arguing and yelling. She would occasionally say she did not want any more visits with her parents because she did not like to see them fight. She also asked the caregivers to wait in the car during visits until she knew what mood the parents were in, describing them as " 'good gummybears' " or " 'bad gummybears.' " The caregivers reported that at times A.G. "seem[ed] so exhausted" and "completely drained," and "want[ed] to be comforted" after the visits.

4

At the 18-month review hearing in March 2021, the juvenile court terminated reunification services and scheduled a section 366.26 hearing for July 2021.  The parents continued to visit with A.G.  In July 2021, A.G. acted lovingly toward her parents, and Mother held and rocked her while telling her that she loved her.  When Mother began to cry, A.G. wiped her tears with a napkin.  Meanwhile, Father had fallen asleep.  A.G. started cleaning and putting on her shoes and repeatedly asking, "where is my aunt, where is my aunt?"  When the caregiver arrived, A.G. jumped and shouted, "Tia!  Tia!"  Father told A.G. to give Mother a kiss goodbye, and A.G. made a moaning sound, quickly got a kiss from Mother, and then began walking toward her caregiver.  After running to her caregiver shouting "[T]ia!  [T]ia!," A.G. shouted back to Mother and Father, "I love you mommy, I love you daddy," only stopping after each parent said it back to her.

At the September 1, 2021 section 366.26 hearing, the juvenile court found the beneficial parent-child relationship exception did not apply and terminated parental rights.  Mother appealed.  (*In re A.G. I., supra*, D079606.)  In our March 1, 2022 opinion resolving that appeal, we explained we were unable to conclude the juvenile court had applied the correct legal standard in determining the beneficial parent-child relationship exception did not apply.  Rather, the totality of the juvenile court's comments at the hearing, including the use of a complex analogy, suggested that the court had improperly focused both on whether Mother held a typical "parental role" and on her continued struggles with the issues leading to the dependency, both factors the California Supreme Court in *Caden C.* had cautioned should not be dispositive of the exception's application.  We reversed and remanded the matter "for further proceedings consistent with this opinion."  (*In re A.G. I., supra*, D079606.)

5

## II.    *Current Proceedings*

Between the September 2021 order terminating parental rights and approximately March 2022, the parents had reached out to the caregivers only once to request a visit with A.G., and the caregivers had declined. During the same period, the Agency evaluated A.G. every month and reported that she was "thriving in her placement."

On March 3, 2022, two days after we issued the *A.G. I* opinion, the Agency made a referral for the parents to resume visitation with A.G.  The Agency observed the parents' first visit on March 24.[4]  A.G. waved at her parents as they approached and jumped up and down.  She hugged her parents and opened a stocking of Christmas gifts they brought.  Mother interacted with A.G. more than Father, who often remained silent and watched A.G. and Mother, even at times when Mother and A.G. tried to engage him in play.  Toward the end of the visit, Father lay down on the ground and remained quiet.  At the end of the visit, the parents hugged and kissed A.G.  Mother repeatedly shouted "I love you," and A.G. would respond the same.  On the drive back to the caregivers' home, A.G. said she loved her parents, liked seeing them, and wanted to see them again.  When she saw her caregiver, she shouted, "[T]ia!" and hugged her.  After her second visit with her parents on April 1, A.G. again stated that she loved her parents and wanted to see them again.

Mother and Father continued to attend supervised visits over the next few months, but Mother often attended them without Father.  Mother and Father usually brought new toys and snacks for A.G., played, and multiple times asked A.G. if she wanted to go to Disneyland with them.  Mother generally behaved appropriately, but Father was less engaged and would sit

---

4    Further undesignated date references are to 2022.

quietly and sometimes fall asleep during the visits. Sometimes the parents did not show up at all. A.G. never indicated any distress at the end of these visits or sadness about leaving her parents.

In May, the social worker informed Mother that she and Father could call the caregivers to check on A.G. or speak with her on Tuesday nights at 8 p.m. According to the caregivers, however, the parents called once on May 10 around 8:30 p.m., and Father did not participate in any other phone calls.

When Mother and Father cancelled their May 23 visit, the Agency ended the parents' visitation services due to their inconsistent attendance, including the parents' no show on April 4; Father's no show on April 11; and Mother's cancellation and Father's no show on May 9. As of May 27, Mother and Father had not called the caregivers to talk with or ask about A.G. for two weeks.

The *A.G. I.* opinion became final on June 16. At a July 6 special hearing, the juvenile court noted its receipt of the remittitur, ordered the parents' rights reinstated, and scheduled a new section 366.26 hearing for September.

In June and July, Mother called and spoke to A.G. four times, and A.G. was excited to speak with Mother. During the June 21 call, A.G. asked to speak with Father, but Mother said he was not available. Mother also called several other times in July, but because she did so on days other than Tuesday or very late, the caregivers did not answer. The social worker repeatedly reminded Mother of the agreed-upon time for calls.

At Mother's request in late June, the Agency re-referred the parents for visitation services. Only Mother attended the next visit on July 22. A.G. ran to Mother, yelled "mommy," and hugged her, and they played with the new toys Mother brought. A.G. was not upset at the end of the visit, which

Mother ended early due to not feeling well.  The same day, the Agency discovered through a search that Father had been incarcerated for felony robbery since June 2.

According to the Agency's September 7 report, the caregivers had repeatedly expressed disappointment in the parents' "lack of consistency" and had indicated this "hurt [A.G.]"  The report noted that A.G. was too young to fully understand the concept of adoption but when asked who she wanted to have in her life forever, she identified her caregivers and Mother.  Regarding visitation, the Agency stated that Father had not had a visit with A.G. since May 16, and even before that date, he had missed two of his six visits and was late to two other visits.  Mother had missed or canceled three of her 10 visits, was late to two other visits, and ended two visits early.

Between mid-August and October, Mother stopped consistently calling A.G. and had called only four of the seven scheduled Tuesdays.  During this time, Mother attended additional visits with A.G. on August 19, August 25, and September 8.  As before, A.G. did not exhibit any distress at the conclusion of visits.

After not having visited A.G. since May, Father joined Mother for three visits on September 15, September 22, and September 29.  During these visits, A.G. hugged and kissed her parents, and Father sometimes played with A.G. on the playground.  At the September 29 visit, A.G. showed her parents a gift her "mom" bought her.  Father corrected A.G., saying she meant her "tia" and pointed to Mother saying, "That's your mom."  A.G. said, "My other mom," and Father said, "[No,] '[t]hat's not your mom[,] that is your aunt.'"  In apparent confusion, A.G. lowered her head and looked down.  At the end of these visits, A.G. and the parents hugged and kissed one another,

8

and A.G. called out "goodbye" as she walked to the social worker's car. She was fairly quiet on the car rides to and from the visits.

Only Mother visited A.G. again on October 20, but both Mother and Father visited on October 27 and carved pumpkins. A.G. made a paper with stickers for her parents that said, "I love you mommy and daddy." At the end of the visit, A.G. hugged and kissed her parents and said goodbye. She was again quiet on the car ride to and from the visits.

The Agency's September, October, and November reports recommended termination of parental rights and a permanent plan of adoption for A.G. In the Agency's September report, the social worker noted that five-year-old A.G. had spent the first 23 months of her life with her parents and a little over three years with her caregivers. The social worker opined that A.G. did not have a substantial, positive, emotional attachment with Father, particularly given that A.G. rarely sought interaction with him during visits and did not show distress when leaving him. As to A.G.'s relationship with Mother, the social worker opined that, although it was evident A.G. loved Mother, often initiated physical and verbal affection toward her, and asked her for help, A.G.'s positive relationship with Mother did not rise to the level of a substantial emotional attachment. The worker explained that A.G. did not show distress or sadness at the conclusion of her visits with Mother and had been negatively impacted by Mother missing visits.

The social worker further reported that the Agency had observed A.G. after the initial termination of parental rights, and for the six months that A.G. lacked any contact with Mother and Father, she continued to grow and thrive in her placement and did not appear negatively impacted by the loss of her parental relationships. Finally, the social worker acknowledged A.G.

9

might struggle with emotional difficulties due to the termination of parental rights but that this potential detriment would not outweigh the benefits of adoption and that the stability and support offered by her caregivers would help negate any such possible trauma.

According to the Agency's November 2022 addendum report, a social worker asked A.G. who she would live with if she could live with anyone, and A.G. indicated her uncle, aunt, and their two sons. When the social worker asked A.G. how she would feel if she did not have any more visits with Mother, A.G. replied, "I would be happy because I live here." Neither Mother nor Father had called A.G. in October. The caregivers reported that after A.G. returned home from visits, she did not talk about the visits with her parents or ask about her parents.

At the November 3 section 366.26 hearing, the juvenile court received into evidence two March 3 reports and reports dated March 28, July 6, September 7, October 26, and November 3. The parents declined to cross-examine the two social workers and did not offer any testimony or affirmative evidence. The court found A.G. was both generally and specifically adoptable.

As to visitation, the court observed, "It may be, to some degree, arguable, that there wasn't regular visitation and contact between [M]o[ther] and child. It is clear, as far as [F]ather . . . that visitation was less." The court went on to find that "regular visitation and contact did take place between [M]o[ther] and [A.G.], . . . after she was given the opportunity to resume her contact and visitation . . . from March 2022 to the present," despite "some gaps."

The court next considered A.G.'s relationship with Mother, stating that it was clear A.G. knew Mother was her mother, as evidenced by her positive reactions and greetings toward her. The court found there was "a visible and

10

understandable emotional attachment" between A.G. and Mother and that for the most part, their interactions had been positive. The court, however, observed that A.G.'s development "continued" and "remained stable," even during the period when she lacked contact with Mother. The court then stated its intention to consider whether the harm of severing A.G.'s relationship with Mother "outweigh[ed] the security of, say, belonging to a family that is where her aunt is the mother figure and her uncle is the father figure." The court observed that the caregivers had "done their best . . . to maintain a neutral and supportive role," had been consistent and supportive, and had reported their observations "in an overall neutral way" that when visits did not take place, A.G. "showed disappointment [and] stress." The court acknowledged A.G.'s relationship with Mother was "substantial" and usually involved "fun," "playing," and "pleasant discussions" but that the relationship was "not one that is contemplated in determining what's in the best interest of the minor child." The court concluded the potential detriment posed by severing that relationship did not outweigh the benefit of adoption for A.G., terminated parental rights, and freed A.G. for adoption.

## DISCUSSION

Father asserts the juvenile court erred by terminating his parental rights because the court should have applied the beneficial parent-child relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i). We disagree.

### I. *Legal Principles*

The permanency planning hearing aims "to end the uncertainty of foster care and allow the dependent child to form a long-lasting emotional attachment to a permanent caretaker." (*In re Emily L.* (1989) 212 Cal.App.3d 734, 742.) The Legislature prefers adoption where possible. (*In re L. Y. L.*

11

(2002) 101 Cal.App.4th 942, 947.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*), disapproved on another ground by *Caden C., supra*, 11 Cal.5th at p. 636, fn. 5.)

Once the juvenile court finds a child is adoptable, the parent bears the burden of proving that one of the exceptions to terminating parental rights exists. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.) One such exception is the beneficial parent-child relationship. (§ 366.26, subd. (c)(1)(B)(i).) For this exception to apply, the parent must show by a preponderance of the evidence: (1) regular visitation and contact with the child; (2) a beneficial parent-child relationship; and (3) that terminating the relationship would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Caden C., supra*, 11 Cal.5th at p. 636.) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Id.* at p. 634.)

We apply a hybrid standard of review on appeal. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530–531 (*In re J.C.*).) We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and

will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.) We review for abuse of discretion the juvenile court's finding that the termination of parental rights would not be detrimental to the child. (*Ibid.*; see also *Jasmine D., supra*, 78 Cal.App.4th at p. 1351 [practical difference between pure substantial evidence standard of review and hybrid standard of review is insignificant].) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd decision.' " ' " (*Caden C.*, at p. 641.)

II.    *Analysis*

The first element required for the beneficial parent-child relationship exception to apply—regular visitation and contact—is "straightforward" and "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra*, 11 Cal.5th at p. 632; § 366.26, subd. (c)(1)(B)(i).)

At the outset, Father complains the juvenile court failed to address whether he satisfied the visitation requirement for the exception to apply. The section 366.26 hearing transcript, however, shows otherwise. Specifically, the juvenile court observed, "It may be, to some degree, arguable, that there wasn't regular visitation and contact between [M]o[ther] and child. It is clear, as far as [F]ather . . . that visitation was less." The court then went on to find that "regular visitation and contact did take place between [M]o[ther] and [A.G.], . . . after she was given the opportunity to resume her contact and visitation . . . from March 2022 to the present." Thus, a fair reading of the court's ruling is that, although it found Mother satisfied the visitation prong, it found Father did not.

Moreover, even construing the juvenile court's finding about Father's inconsistent visitation to be merely an implied one, that implicit finding is

13

supported by substantial evidence. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 [no requirement that "the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception"].) In the first year of the dependency proceedings, the caretakers reported that Father (as well as Mother) missed visits without canceling and often showed up hours late without calling. The Agency similarly opined during the reunification period that "[F]ather's visits [we]re not always consistent," including missing two December 2020 visits. Between April and September 2021, the parents missed another four visits and asked to shorten two of them.

After the reversal on appeal, the parents began supervised visits again in March 2022. But Mother often attended those visits *without* Father. Within a couple of months, the Agency ended the parents' visitation services because of their poor attendance. The Agency noted that, in April and May 2022, Father missed four visits with A.G., and had not visited A.G. once in the nearly four months between May 16 and September 7, 2022.[5] Father showed up to only one of two visits in October. And despite being encouraged to call A.G. at the caregivers' home on Tuesday nights, Father called only once—with Mother—on May 10, 2022. Accordingly, substantial evidence supported the court's finding, implied or not, that Father did not carry his burden to establish regular and consistent visitation with A.G.

But even assuming Father had made this showing, substantial evidence also supported a finding that A.G. did not have the requisite

---

5       Even disregarding the period of time during which Father was incarcerated beginning on June 2, the record still contains substantial evidence supporting a finding that his visitation with A.G. was not regular and consistent.

"significant, positive, emotional attachment" to Father.[6] (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) Factors relevant to this determination include the child's age, the amount of time the child spent in the parent's custody, the interaction between parent and child, and the child's needs. (*Caden C., supra*, 11 Cal.5th at p. 632.) The court should also examine "how children feel about, interact with, look to, or talk about" the parent. (*Ibid.*)

To be sure, A.G. had a relationship with Father. As Father contends, she called him "daddy," jumped up and down in excitement when she saw her parents again in March 2022, often greeted Father warmly with hugs and kisses, played with the parents during visits, and exchanged "I love yous." In March and April, A.G. told the social worker that she loved her parents and wanted to see them again.

Substantial evidence in the record, however, supports a finding that A.G.'s relationship with Father fell short of the significant emotional attachment required for the beneficial parent-child relationship exception to apply. Five-year-old A.G. spent the first 23 months of her life with her parents and a little over three years—more than half of her life—with her caregivers. Although Father sometimes played with and interacted with A.G. during visits, at other times, he would fall asleep during visits, lay on the floor, or sit silently and not engage with her. The social worker observed that

---

6    We also reject Father's contention that the record is unclear about whether the juvenile court found the second prong satisfied only for Mother or instead, for Father, too. The juvenile court clearly limited this finding to Mother, including prefacing its examination of the beneficial parent-child relationship with, "[S]o the court has to go to the next prong to ask, the relationship *between* [*Mother*] *and* [*A.G.*], is this relationship beneficial to the child?" (Italics added.)

15

A.G. rarely tried to interact with Father during visits and never showed distress when leaving him, including during his most recent visits in 2022.[7]

Moreover, some of Father's visits with A.G. caused her fear, confusion, or sadness. For example, during the July 2020 incident when Father yelled at Mother and relatives, A.G. was scared and sad, saying "Daddy[,] no, no, no." A.G. would say things to the caregivers like "Daddy don't hit mommy" and "[poor] mommy, daddy hit her." During visits in 2021, A.G. would return home to the caregivers exhausted and drained, sometimes saying "No more momma or dada." She previously asked her caregiver to stay in her car during some of these visits, and A.G. would tell the caregivers whether her parents had been good or bad "gummybears," sometimes calling them "ugly gummy bear[s]." And in September 2022, when Father corrected A.G. after she referenced her caregiver as "mom," A.G. responded with confusion by lowering her head and looking down.

---

[7] In a one-sentence argument, Father additionally complains the section 366.26 report lacked an assessment of "the duration and character of the relationship" between A.G. and the parents. Because Father failed to object to the sufficiency of the Agency's reports during the section 366.26 hearing, this argument is forfeited. (See, e.g., *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-412 [mother's failure to object to sufficiency of assessment reports at section 366.26 hearing waived argument on appeal].) Regardless, even if we considered the argument, we would reject it based on the Agency's September 7, 2022 report's opinions and observations about A.G.'s relationship with the parents. Indeed, as to Father's relationship with A.G., the social worker specifically opined that A.G. and Father lacked a substantial positive emotional attachment based on the 23-month duration of A.G.'s care with her parents, the lack of consistent visitation and contact with Father, that A.G. "rarely sought out interaction/attention" from Father, and that A.G. never showed distress upon leaving him. Moreover, to the extent Father contends the juvenile court erred by not ordering a bonding study, he is incorrect. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 [no legal requirement that court must secure bonding study before terminating parental rights].)

16

When she would arrive home from her visits in 2022, A.G. would never talk with the caregivers about her visits or ask about Father. And although A.G. was too young to understand adoption, when a social worker asked her who she would live with if she could live with anyone, she indicated her caregivers (her uncle and aunt) and their two sons.

Accordingly, substantial evidence supported a finding that A.G.'s relationship with Father lacked the required significant emotional attachment for the beneficial parent-child relationship exception to apply. (See, e.g., *In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 [a parent must demonstrate something "more than frequent and loving contact, an emotional bond with the child, or pleasant visits"]; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 ["the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt"].)

Finally, even assuming there was a beneficial parent-child relationship between Father and A.G., we nevertheless conclude the juvenile court did not abuse its discretion by implicitly finding that the benefits offered by adoption outweighed any detriment caused by terminating his parental rights. Father's attorney did not present any evidence that A.G. would be greatly harmed by severing Father's relationship with her, or that the security and stability of adoption would not outweigh the loss of this relationship. (*Caden C., supra*, 11 Cal.5th at p. 633.) Instead, the social worker's assessment concluded that terminating Father's parental rights would not outweigh the benefits of adoption and the stability and support offered by the caregivers would help negate any such possible trauma. Indeed, the social worker also emphasized that it had observed A.G. after the initial termination of parental rights and, despite lacking any contact with Father

17

for those six months, A.G. continued to grow and thrive in her placement and did not appear negatively impacted by the loss of her parental relationships. Thus, on this record, there was no abuse of discretion.[8] (See *In re J.C., supra*, 226 Cal.App.4th at pp. 530–531.)

Father suggests the court "may have considered improper factors" by comparing A.G.'s relationship with her parents[9] to her relationship with her caregivers. Although it is true that a juvenile court cannot consider a minor's relationship with her caregivers when determining whether the minor has a significant, positive, emotional attachment to a parent, the record does not show that the court did so here. (*In re J.D.* (2021) 70 Cal.App.5th 833, 864-865 [application of exception "is not a contest between two potential custodial caregivers"].) Rather, the court stated its intention to evaluate "if the harm of severing the relationship outweighs the security of, say, belonging to a family that is where [A.G.'s] aunt is the mother figure and her uncle is the father figure." Thus, the court indicated it was considering the benefits of a new adoptive home in conducting the *weighing analysis*, not in evaluating

---

[8] To the extent Father intended to assert the juvenile court also erred in finding the exception did not apply to preclude termination of *Mother's* parental rights, it is unclear whether he has standing to do so. (See, e.g., *In re Caitlin B.* (2000) 78 Cal.App.4th 1190 [holding that a mother challenging an order terminating the parental rights of both herself and the child's alleged fathers lacked standing to contend the alleged fathers failed to receive proper notice of the section 366.26 hearing]; *In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1806 [parent may not raise issues on appeal which do not affect his or her own rights].) Regardless, and even considering such an argument, we would conclude the court's findings as to Mother were supported by substantial evidence and not an abuse of discretion.

[9] Notably, the court's statements with which Father takes issue concern the beneficial parent-child relationship exception's application to Mother, not Father.

A.G.'s attachment. This was proper. (*Caden C., supra*, 11 Cal.5th at p. 634 ["[T]he court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer' "].)

Father similarly claims that the court impermissibly compared the caregivers' attributes with those of the parents by describing the caregivers as "neutral," "consistent," and "supportive." When read in context, however, these statements indicate the court was explaining why it found the caregivers' observations and reports during the dependency to be credible, not—as *Caden C.* cautions against—making "a contest of who would be the better custodial caregiver."[10] (*Caden C., supra*, 11 Cal.5th at p. 634.) This, too, was not error. (*Id.* at p. 640 [as a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' "].)

Finally, Father cites to various cases in which courts found the beneficial relationship exception applied. But because these cases are distinguishable on their facts, they do not compel a different conclusion. (See, e.g., *In re S.B.* (2008) 164 Cal.App.4th 289, 295, 298 [bonding study supported beneficial parent-child relationship, and minor was upset when

---

[10] The court stated in relevant part: "There were reports and observations made of – by the – caregivers. And the court understands, certainly, they are doing their best to, and they have done their best, to maintain a neutral and supportive role, albeit, the report does show some frustration, based on what happened in the outcome of the appeal that resulted in, now, a second .26 hearing. But that doesn't mean that they are against, specifically, the parents . . . . The court finds that the evidence shows they've been consistent. They've been supportive. They've been as neutral as humanly possible. And they also have reported what they've seen in an overall neutral way, that the minor, when visits were not taking place, had a – had a reaction that showed disappointment, stress, and that happens."

visits with father ended, did not want to leave, and said she wished she lived with father]; *In re Amber M.* (2002) 103 Cal.App.4th 681, 689-690 [parent completed her case plan, sought minor's return via section 388 petition, CASA recommended minor's return to parent, and bonding study showed a " 'primary attachment' " between parent and another minor]; *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1535-1538 [affirming order applying exception where mother and grandmother testified to beneficial relationship between minors and mother].)

Accordingly, for the previous reasons, Father has not demonstrated error, and it will not be presumed here.  (See *People v. Tang* (1997) 54 Cal.App.4th 669, 677 [" 'We must indulge in every presumption to uphold a judgment, and it is [appellant's] burden on appeal to affirmatively demonstrate error—it will not be presumed"].)

DISPOSITION

The order is affirmed.

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

BUCHANAN, J.